**L'ANZA RESEARCH INTERNATIONAL, INC., Plaintiff–Appellee,**

v.

**QUALITY KING DISTRIBUTORS, INC., a New York Corporation, Defendant–Appellant.**

No. 95–56447.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 6, 1996.

Decided Oct. 22, 1996.

Melodie K. Larsen, Rintala, Smoot, Jaenicke & Rees, Los Angeles, California, for defendant-appellant.

Raymond H. Goettsch, LaTorraca and Goettsch, Long Beach, California, for plaintiff-appellee.

George W. Nowell, Law Offices of George W. Nowell, San Francisco, California, for amicus curiae American Free Trade Association.

Deborah M. Lodge, Patton Boggs, L.L.P., Washington, DC, for amicus curiae Beauty and Barber Supply Institute, Inc.

Before: D.W. NELSON, T.G. NELSON, and THOMAS, Circuit Judges.

D.W. NELSON, Circuit Judge:

This case involves a copyright infringement claim brought by L'anza Research International, a manufacturer and distributor of hair care products, against Quality King Distributors pursuant to 17 U.S.C. § 602(a). Section 602(a) prohibits the importation of U.S. copyrighted goods acquired outside of the United States without the authorization of the copyright owner. Quality King appeals the district court's order specifying issues existing without substantial controversy and granting summary judgment in favor of L'anza. It also appeals the district court's order granting a permanent injunction prohibiting Quality King from importing and selling certain L'anza hair care products in the United States. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

L'anza manufactures and distributes hair care products. In order to establish and maintain its reputation for selling high quality products, L'anza requires that its U.S. distributors sell L'anza products only to authorized vendors such as beauty salons and colleges. L'anza also sells its products abroad through "master distributors," who may sell L'anza products within defined geographical areas outside of the United States. These overseas distributors pay approximately 35 to 40% less for L'anza products than do domestic distributors because they do not receive the benefit of L'anza's extensive advertising and promotional activities conducted in the United States but rather, must market the products themselves. L'anza asserts that it has never authorized any distributor to import into the United States L'anza products that have been sold abroad.

In February, 1994, L'anza discovered that a number of its products were being sold at Vessey Drugs, in Carmel, California. Because in every shipment some L'anza bottles are marked to allow tracing, L'anza was able to determine that the products being sold at Vessey Drugs had been purchased from a distributor in Malta, L. Intertrade, and imported (without L'anza's authorization) by Quality King Distributors. Originally, the products had been manufactured in the United States and then sold through L'anza's distributor in the United Kingdom, Planetary Eco, to L. Intertrade. L'anza sold the products at a substantial discount with the understanding that they would be distributed in Malta, and possibly Libya. Instead, L. Intertrade sold the products to Quality King Distributors, which purchased in their entirety the three shipments that had been sent to the United Kingdom [1] and imported the products back into the United States without

---

1. It is not clear from the record whether the products actually reached Malta. However, the evidence in the record indicates that the products were, in fact, shipped to the United Kingdom.

L'anza's permission. It then sold them to a number of buyers, including Vessey Drug.

The record indicates that a L'anza representative purchased the following products from Vessey Drug: Styling Foam, Multi–Mist, Super Quatre Spray, and Remede Shampoo. However, the shipments that Quality King purchased from L. Intertrade and imported to the United States also contained a number of other L'anza products. L'anza owns the copyright for the labels on many of these products, the registration for which was issued on January 7, 1994 (Copyright Registration TXU 593–178). Copyright Registration TXU 593–178 lists the following products: Super Quatre, Multi–Mist, Lavenda, Biotane, Vitro, Remede, Curls & Color Moisturizing Treatment, Re–Balance Leave–In Conditioner, Re–Balance Shampoo Plus, Re–Balance Styling Foam. L'anza also requests that the court take judicial notice of copyright registrations issued July 21, 1995 for the same products as are listed in Copyright Registration TXU 593–178 plus Curls & Color Moisturizing Shampoo.

L'anza filed a complaint against Quality King and others who were selling L'anza products that they had purchased from Quality King alleging that they had violated § 602(a) of the 1976 Copyright Act by importing products to which L'anza owned the copyright without L'anza's permission.[2] Quality King responded by denying that it had violated L'anza's copyright and raising two affirmative defenses: 1) the first sale doctrine of 17 U.S.C. § 109(a); and 2) unclean hands arising from L'anza's intent to sell the products at issue to Libya in violation of the Libyan trade embargo.

L'anza then moved for an order specifying issues without substantial controversy and sought summary judgment on Quality King's first sale defense as well as a determination that L'anza owned all right, title and interest in copyright registration No. TXU 593–178. *Id.* The district court granted L'anza's motion on May 4, 1995. On July 25, 1995, the district court also granted L'anza's motion for a permanent injunction enjoining Quality

King from importing and selling the following L'anza products that had been sold previously outside of the United States: Multi–Mist, Lavenda, Biotane, Vitro, Remede, Curls & Color Moisturizing Shampoo, Re–Balance Leave–In Conditioner, Re–Balance Shampoo Plus and Re–Balance Styling Foam. Finally, on September 29, 1995, the district court entered judgment in the amount of $132,616 in damages (stipulated by the parties to avoid trial) in favor of L'anza.

On appeal, Quality King challenges the district court's judgments on a number of grounds, asserting that: 1) the district court erred in rejecting Quality King's first sale defense and declining to adopt the Third Circuit's holding in *Sebastian Int'l Inc. v. Consumer Contacts, Ltd.*, 847 F.2d 1093 (3d Cir.1988); 2) the district court erred in finding that L'anza had provided adequate evidence to show that Quality King had acquired the L'anza products outside of the United States and without L'anza's authorization, both prerequisites of § 602(a); 3) the district court erred in rejecting Quality King's unclean hands defense; 4) the district court erred because L'anza does not own the copyright to some of the products that Quality King imported, and therefore does not have standing to bring copyright claims for all of the products that are the subject of its lawsuit; 5) the district court's injunction should be vacated because it is overbroad in that it enjoins lawful as well as unlawful behavior and because it does not provide Quality King with adequate notice of when it is violating the injunction.

## STANDARD OF REVIEW

A grant of summary judgment is reviewed de novo. *Jesinger v. Nevada Federal Credit Union*, 24 F.3d 1127, 1130 (9th Cir.1994). We review a district court's determinations as to party standing de novo. *Barrus v. Sylvania*, 55 F.3d 468, 469 (9th Cir.1995). The scope of injunctive relief is reviewed for an abuse of discretion or application of erroneous legal principles. *Dexter*

---

**2.** L'anza also brought a tort action against Quality King in state court, which went to trial in April, 1995. In May, the jury returned a verdict

in favor of L'anza, finding by clear and convincing evidence that Quality King had acted with malice and fraud against L'anza.

*v. Kirschner,* 984 F.2d 979, 982 (9th Cir. 1992).

## ANALYSIS

### I. *The First Sale Doctrine and Section 602(a)*

█ Quality King asserts that the district court erred in holding that L'anza's claim under § 602(a) of the 1976 Copyright Act is not barred by the first sale doctrine of § 109(a). Section 602(a) provides in relevant part, that:

> Importation into the United States, without the authority of the owner of copyright under this title, of copies or phonorecords of a work that have been acquired outside the United States is an infringement of the exclusive right to distribute copies or phonorecords under section 106, actionable under section 501.

17 U.S.C. § 602(a). Section 602(a), thus, gives the copyright owner a distribution right under § 106. Section 106 provides in relevant part, that:

> Subject to sections 107 through 120, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:
>
> . . .
>
> 3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease or lending;

17 U.S.C. § 106(3). The first sale doctrine, however, limits the rights embodied in § 106(3), providing that:

> Notwithstanding the provisions of section 106(3), the owner of a particular copy or phonorecord lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord.

17 U.S.C. § 109(a). From the text of the 1976 Copyright Act, it is unclear whether § 602(a) creates a right that is distinct from § 106(3) and therefore is not limited by § 109(a), or alternatively, whether § 602(a) is merely an extension of § 106(3) and therefore *is* limited by § 109(a).

In resolving the question of whether the first sale doctrine applied in this case, the district court was faced with an issue of first impression. The Ninth Circuit has held that the first sale doctrine *does not* bar an action under § 602(a) where there has been a lawful sale abroad of foreign manufactured U.S. copyrighted goods. *Parfums Givenchy v. Drug Emporium,* 38 F.3d 477, 480–481 (9th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1315, 131 L.Ed.2d 197 (1995); *see also BMG Music v. Perez,* 952 F.2d 318, 319 (9th Cir.1991), *cert. denied,* 505 U.S. 1206, 112 S.Ct. 2997, 120 L.Ed.2d 873 (1992). However, it has explicitly declined to pass upon the question of whether the first sale doctrine would bar an action involving the exportation and later importation of U.S. copyrighted goods originally manufactured in the United States. *BMG Music* 952 F.2d at 319 n. 3.

The district court relied upon the Ninth Circuit rule that " 'the words "lawfully made under this title" in § 109(a) grant first sale protection only to copies legally made and sold in the United States.' " District Court Order filed July 7, 1995 [hereinafter, District Court Order] (quoting *Drug Emporium,* 38 F.3d at 481 (quoting *BMG Music,* 952 F.2d at 319)). It found that although the copies at issue were made in the United States, they were not sold in the United States, and therefore, the first sale doctrine did not apply. It reached this conclusion based on the fact that L'anza intended that the products would be sold exclusively outside of the United States, explaining that:

> [b]ecause L'anza's copyrighted works were sold to a foreign distributor for distribution in foreign markets, the court finds that the sale occurred outside the United States. . . . To hold otherwise would undermine the stated purpose of § 602 . . . and the principle that a copyright owner is entitled to realize the full value of each copy upon its disposition.

District Court Order. The court also noted that Quality King's argument that the goods were sold in the United States because that is where title passed from L'anza to Planetary Eco (the U.K. distributor) was "irrelevant," explaining that

[w]hen title passes does not necessarily indicate a "sale" for the purposes of the "first sale" defense to copyright infringement. *See Cosmair, Inc. v. Dynamite Enterprises,* 1985 WL 2209, *3 (S.D.Fla.1985) ("it is not clear whether the passing of title rather than the intent of the parties is determinative of whether there was a sale in the United States . . .").

*Id.* at 6 n. 5.

In holding that the first sale doctrine did not apply in this case, the district court declined to follow the approach taken by the Third Circuit in *Sebastian Int'l Inc. v. Consumer Contacts Ltd.,* 847 F.2d 1093 (3d Cir. 1988). In *Sebastian,* a manufacturer of hair care products, Sebastian International, entered into an oral contract with the defendant to distribute its products to salons in South Africa but not elsewhere. *Id.* at 1094. The products were shipped to South Africa but then were reshipped to the United States and sold. *Id.*

The *Sebastian* court noted that the facts in that case were distinguishable from a number of district court cases in which courts had found that the first sale doctrine did not apply, where "the copies were produced abroad and the sales occurred overseas." *Id.* at 1098. However, it went on to note that "the place of sale is not the critical factor in determining whether section 602 governs." *Id.* at 1099. The court reasoned that:

> Nothing in the wording of section 109(a), its history or philosophy, suggests that the owner of copies who sells them abroad does not receive a "reward for his work." Nor does the language of section 602(a) intimate that a copyright owner who elects to sell copies abroad should receive "a more adequate award" than those who sell domestically. That result would occur if the holder were to receive not only the purchase price, but a right to limit importation as well.

*Id.* Thus, the court held that the first sale doctrine bars an action under § 602(a) *even if the goods were sold outside of the United States,* so long as the goods were manufactured in the United States and sold by the copyright owner. *Id.* at 1098.

We decline to adopt the approach taken by the Third Circuit in *Sebastian.* However, we emphasize that our holding does not depend upon the words "lawfully made under this title" in § 109(a), which have been interpreted by this and other courts to grant first sale protection only to copies legally made and sold in the United States. *See BMG,* 952 F.2d at 319; *Drug Emporium,* 38 F.3d at 481; *see also T.B. Harms Co. v. Jem Records, Inc.,* 655 F.Supp. 1575, 1583 (D.N.J. 1987); *Columbia Broadcasting System, Inc. v. Scorpio Music Distributors, Inc.,* 569 F.Supp. 47, 49 (E.D.Pa.1983), *aff'd,* 738 F.2d 421 (3d Cir.1984). Rather, we rely upon the alternative ground on which *BMG* and *Drug Emporium* were decided, that § 602(a) would be rendered meaningless if § 109(a) were found to supersede the prohibition on importation in this case. *See BMG,* 952 F.2d at 319; *Drug Emporium,* 38 F.3d at 481.

*The Logic of* Scorpio

The conclusion that the words "lawfully made under this title" in § 109(a) apply only to goods manufactured and sold in the United States was first articulated in *Columbia Broadcasting System v. Scorpio Music Distributors,* 569 F.Supp. at 49. There, Scorpio Music Distributors had purchased phonorecords from a corporation that had manufactured them legally in the Philippines. Scorpio then imported the records without the authorization of CBS, which owned the copyrights to the records, and CBS brought an action pursuant to § 602(a). The court rejected Scorpio's argument that the action was barred under § 109(a) because the records had already been the subject of a lawful first sale. The court reasoned that:

> Defendant's contentions would be more persuasive were it not for the phrase— lawfully made under this title—in § 109(a). I conclude that the section grants first sale protection to the third party buyer of copies which have been legally manufactured and sold within the United States and not to purchasers of imports such as are involved here. The protection afforded by the United States Code does not extend beyond the borders of this country unless the Code expressly states. Absent a clearly expressed legislative intent to the con-

trary, statutory language must be recognized as conclusive. *Id.* (citations omitted). In addition, the court said, "construing § 109(a) as superseding the prohibition on importation ... would render § 602 virtually meaningless." *Id.* The Ninth Circuit adopted the approach of *Scorpio* in *BMG Music,* 952 F.2d at 319.

While many courts, including the Ninth Circuit, have followed *Scorpio,* the consensus among legal scholars is that the reasoning of *Scorpio* is flawed. *See* 2 Nimmer on Copyright, § 8–12[B][6] at 8–157 n. 95 (1996); 1 Paul Goldstein, Copyright § 5.6.1, at 604 (1989); Stephen W. Feingold, *Parallel Importing Under the Copyright Act of 1976,* 17 N.Y.U.J. Int'l L. & Pol. 113, 130 (1984). Courts, too, have expressed uneasiness about *Scorpio*'s reasoning. *See, e.g., Drug Emporium,* 38 F.3d at 482 n. 8; *Sebastian,* 847 F.2d at 1098 n. 1. In fact, the district court explicitly rejected the approach of the *Scorpio* court in *Parfums Givenchy v. C & C Beauty Sales,* 832 F.Supp. 1378, 1386 (C.D.Cal.1993).

The *Scorpio* court appeared to rely upon two different justifications for finding that § 109(a) does not apply outside of the United States: 1) it is generally presumed that the U.S.Code does not apply extraterritorially, and 2) the words "lawfully made under this title" were intended to refer only to copies made and sold in the United States. *Scorpio,* 569 F.Supp. at 49. As the *C & C* court explained, neither justification is well-founded:

> Absent a clearly expressed statutory intent to the contrary, courts should presume that the United States Code applies only to actions "occurring within, or having effects within" the United States.... However, the unauthorized importation into and distribution within the United States of copyrighted goods clearly has an effect within the United States—it prevents the United States copyright owner from realizing the full value of each copy released into the United States market with his authorization. Thus, the judicial presumption against the application of United States statutory law does not apply in cases such as *BMG Music, Scorpio,* or the present

case.... [Moreover], the legislative history of Section 109(a) reveals that the phrase "lawfully made under this title" ... makes no reference to the location of the manufacture or sale of the goods.

832 F.Supp. at 1386–1387 (citations omitted). However, the *C & C* court agreed with *Scorpio*'s holding based on the alternative ground offered by *Scorpio* that § 602(a) would be rendered meaningless if the first sale doctrine were found to supersede the ban on importation. *Id.* at 1387; *see also BMG Music* at 319. This rationale justifies the district court's decision in this case as well.

*Congressional Intent Underlying Sections 106(3), 109(a) and 602(a)*

The *C & C* court explained that the distribution right in § 106(3) allows the copyright owner to decide "when, under what circumstances, and for what price he will release copies of his work to the public." 832 F.Supp. at 1388. However, once the copyright owner has voluntarily sold his work to the public, the new owner may transfer or sell the copy without the permission of the copyright owner, pursuant to § 109(a). This first sale doctrine "presupposes that the copyright owner will be able to realize the full value of each authorized copy ... upon its first sale to a purchaser." 1 Goldstein, Copyright, § 5.5. at 588–589. Thus, once the copyright owner has received his full value for the copy, the policy goal of protecting the copyright holder gives way to the policies disfavoring limitations on the alienation of property. *C & C,* 832 F.Supp. at 1388. *See also Platt & Munk, Co. v. Republic Graphics, Inc.,* 315 F.2d 847, 854 (2d Cir.1963) ("[T]he ultimate question embodied in the 'first sale' doctrine [is] whether or not there has been such a disposition of the article that it may fairly be said that the patentee (or copyright proprietor) has received his reward for the use of the article.").

The prohibition of § 602(a) against unauthorized importation of goods acquired outside of the United States was adopted in response to concerns expressed by members of the printing and recording industries concerning their lack of ability to control impor-

tation of copyrighted goods. Staff of House Comm. on the Judiciary, 88th Cong., 1st Sess., Copyright Law Revision (Part 2: Discussion and Comments on Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law 212 (Comm. Print 1963)) [hereinafter, 1963 Discussion and Comments]. Prior to the adoption of the 1976 Copyright Act, it was forbidden to import any "piratical" copies of a work, that is, copies made without the authorization of the copyright owner. Copyright Act of 1909 § 106. Section 602(a), in contrast, was intended to prohibit the importation not only of piratical copies but also copies that were lawfully made. *See* H.R.Rep. No. 1476, 94th Cong., 2d Sess. 169 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5785.

The legislative history of the 1976 Copyright Act contains no explicit reference to the interaction between §§ 602(a) and 109(a). However, the scenarios that were discussed by representatives of the printing and recording industries in assessing § 602(a) suggest that § 109(a) was not intended to limit the scope of § 602(a). A typical scenario was described by one publisher as follows:

> frequently you run into a situation where there is a copyright proprietor in the United States and copies of the same work ... produced in a foreign country, may be shipped over here without violating any contract of the U.S. copyright proprietor. This is either because ... the [foreign] publisher *sold it* to an individual who in turn shipped it over here ... or because of some network of contract rights....

1963 Discussion and Comments at 213 (emphasis added). A music industry representative noted that:

> We've had a similar situation with respect to motion picture prints, which are sent [from the United States] all over the world—legitimate prints made from the authentic negative. These prints get into illicit hands. They're stolen, and there's no contractual relationship.... Now [these] are not piratical copies.... They could not come within [section 106 of the 1909 Copyright Act].

*Id.* In other words, importation of copies from *outside* of the United States was under-

mining the right guaranteed to U.S. copyright holders in § 106(3) to control the distribution (including the price and quantity) of copies distributed through authorized channels *within* the United States. As a result, copyright owners were deprived of the "full value" to which they were entitled for the copies sold within the United States, even though the imported copies may have been the subject of a valid first sale.

The *C & C* court explained this point as follows:

> [The] "full value"—the price at which the copyright owner is willing to sell copies of his work—depends on market conditions and, in today's global economy, varies from country to country. For example, the owner of a copyright in a sound recording may demand $10 each to sell 1 million phonorecords of that sound recording in the United States, but may be willing to sell another 1 million phonorecords for $7 each in Australia in order to enter the market there or for some other legitimate business purpose. If the phonorecords originally sold for $7 in Australia are allowed to enter the United States, where they may then be sold again for, say, $8, the United States copyright owner is forced to compete with that price, and thus is prevented from receiving the $10 to which he is entitled for each of the phonorecords initially released into the United States market.

*C & C*, 832 F.Supp. at 1390–91. Thus, the *C & C* court concluded,

> [a]pplying the first sale doctrine to actions for unauthorized importation of goods manufactured and first sold abroad would violate [the principle that the copyright owner is entitled to realize the full value of each copy or phonorecord upon its disposition] and defeat Congress' intent, in enacting Section 602(a), to expand importation protection for copyright owners so as to avoid circumvention of the distribution right.

*Id.* at 1391.

Although *C & C* addressed the importation of copies manufactured outside of the United States, its logic is equally applicable to the

scenario at issue here, where the copyright owner sold U.S. manufactured goods at a substantial discount, with the intent that they would be sold exclusively outside of the United States (Quality King concedes that the goods were to be sold outside of the United States). Just as in the example offered by *C & C*, the unauthorized importation of these goods undercuts L'anza's ability to receive the full value for L'anza products sold in the United States through authorized channels, notwithstanding the fact that the imported products were manufactured in the United States and sold by L'anza. As a result, it would contradict the congressional intent underlying §§ 106(3), 109(a) and 602(a) if we were to hold that § 109(a) barred liability under § 602(a) in this case.

The *Sebastian* court arrived at a contrary conclusion because it found that the copyright owner received the full value for the products that it sold to the South African distributor, in the form of the purchase price. 847 F.2d at 1099. It may be that in *Sebastian*, the hair care products were not sold at a substantial discount, as they were in this case. Nonetheless, the *Sebastian* court appears to have missed the crucial point that unauthorized imports cause copyright owners to lose control over domestic distribution, thus driving prices down for goods sold *through authorized channels in the U.S. market*. This is just the evil that Congress sought to prevent in adopting § 602(a).

Finally, we reject the argument made by Amicus Curiae American Free Trade Association ("AFTA") that changes made by Congress in 1990 concerning the application of the first sale doctrine with respect to computer software indicate that Congress intended that § 602(a) should be limited by § 109(a). Specifically, AFTA argues that when Congress amended § 109(e) of the copyright law to overrule the Fourth Circuit's decision in *Red Baron–Franklin Park*

*v. Taito Corp.*, 883 F.2d 275 (4th Cir.1989), *cert. denied*, 493 U.S. 1058, 110 S.Ct. 869, 107 L.Ed.2d 952 (1990), it implicitly endorsed the district court's opinion in that case.[3] The court rejected this argument in *Drug Emporium*, 38 F.3d at 482–83 n. 9, and so do we.

The district court in *Red Baron* followed (and expanded upon) the rule of *Sebastian*, holding that the first sale doctrine barred an action pursuant to § 602(a) claiming unauthorized importation of U.S. copyrighted computer circuit boards that were lawfully manufactured and sold in Japan and then imported to the United States. *Red Baron–Franklin Park, Inc. v. Taito Corp.*, 9 U.S.P.Q.2d 1901, 1903 (E.D.Va.1988), *rev'd*, 883 F.2d 275 (4th Cir.1989), *cert. denied*, 493 U.S. 1058, 110 S.Ct. 869, 107 L.Ed.2d 952 (1990). However, the Fourth Circuit reversed on other grounds, finding that the first sale doctrine did not apply to the public performance right under § 106(4). The court did not address the relationship between the first sale doctrine and § 602(a) because this issue was not raised on appeal. 883 F.2d at 278. Thus, in amending § 109(e), Congress was concerned about the relationship between the first sale doctrine and § 106(4), not the relationship between the first sale doctrine and § 602(a). *See* H.R.Rep. No. 101–735, 101st Cong., 2d Sess. 9, *reprinted in* 1990 U.S.C.C.A.N. 6935, 6938–40.

## II. *Whether Quality King Violated Section 602(a)*

Even if the first sale doctrine does not bar L'anza's § 602(a) action, Quality King contends that L'anza failed to establish that Quality King actually violated § 602(a). Quality King argues that L'anza did not demonstrate that 1) the products at issue were acquired outside of the United States; and 2) they were imported without L'anza's authorization. Both assertions lack merit.

---

**3.** Section 109(e) provides that:

Notwithstanding the provisions of sections 106(4) and 106(5), in the case of an electronic audiovisual game intended for use in coin-operated equipment, the owner of a particular copy of such a game lawfully made under this title, is entitled, without the authority of the copyright owner of the game, to publicly per-

form or display that game in coin-operated equipment, except that this subsection shall not apply to any work of authorship embodied in the audiovisual game if the copyright owner of the electronic audiovisual game is not also the copyright owner of the work of authorship. 17 U.S.C. § 109(3).

*"Acquired outside of the United States"*

█ Quality King asserts that the goods at issue in this case were not "acquired outside of the United States" as required by § 602(a) because when L'anza sold the products to its U.K. distributor, Planetary Eco, title to the goods passed in the United States. This argument is flawed. Quality King appears to conflate the question of whether there was a "first sale" in the United States with the question of whether the goods were "acquired outside of the United States" for the purposes of § 602(a). These two inquiries are not necessarily the same. In fact, it is not clear from the statute which point in the chain of acquisition the requirement that a good be "acquired outside of the United States" relates to. Because there are no cases which squarely hold that a good was "acquired outside of the United States" in violation of § 602(a) where the goods were manufactured in the United States, this too is a question of first impression.

We find that the copies were acquired outside of the United States for two reasons. First, the record indicates that Quality King purchased the L'anza products from a sub-distributor in Malta, that the products did, in fact, leave the United States in three shipments to the United Kingdom, and that they were destined for Malta.[4] Thus, this case is distinguishable from *Denbicare U.S.A., Inc. v. Toys "R" Us, Inc.,* 84 F.3d 1143 (9th Cir.1996). In *Denbicare,* the plaintiff itself had imported the products at issue from its foreign manufacturer, and the products were being held in a foreign trade zone in San Francisco when the sale occurred. 84 F.3d at 1145. The court held that a foreign trade zone is part of the United States, and therefore, that the products were not "acquired outside of the United States" for the purposes of § 602(a). *Id.* at 1149. Therefore, the court did not reach the issue of the interaction between § 602(a) and the first sale doctrine.

Second, we reject the argument that the goods were not acquired outside of the United States because the *first* sale occurred in the United States (even assuming that this is true). Such an approach would, *de facto,* limit the right created in § 602(a) by the first sale doctrine. For the reasons stated in the preceding section, this would be contrary to congressional intent.

*"Without L'anza's authorization"*

█ Quality King also asserts that L'anza's § 602(a) claim should fail because L'anza did not produce admissible evidence that the products were reimported without L'anza's authorization. Specifically, Quality King argues that L'anza should have produced a "master agreement" between Planetary Eco and L. Intertrade (the distributor in Malta) forbidding the importation of the L'anza products. Alternatively, it argues that L'anza should have produced evidence that the products were marked "for export only."

Section 602(a), by its plain terms, places the burden on the defendant to prove that the allegedly infringing goods were imported *with* the authorization of the U.S. copyright owner. L'anza produced affidavits from the heads of L'anza and Planetary Eco stating that it was always the intent of both parties that the goods would be sold outside of the United States. In fact, Quality King concedes that the goods were to be sold outside of the United States. Further, in an affidavit, the president of L'anza stated that L'anza had never authorized the importation of the goods at issue in this case. Quality King does not even *argue* that the importation of these goods was authorized, much less present any evidence of authorization. Thus, we reject this argument.

III. *Quality King's "Unclean Hands" Defense*

█ Quality King also argues that L'anza's action should be barred because of its "unclean hands." According to Quality King, L'anza had unclean hands because it exported the goods at issue in this case with the intent that they should ultimately be shipped to Libya, in violation of Executive

---

4. As both parties appear to have conceded in the briefs that the L'anza products left the United States in three shipments, we do not address

Quality King's unsupported assertion, raised for the first time at oral argument, that the products never left the United States.

Order 12543 (Jan. 7, 1986) and 31 C.F.R. § 550.409. Quality King relies in support of its argument upon the affidavit of Robert De Lanza (Founder and Chairman of the Board of Directors of L'anza), in which he states that the products were sold to L. Intertrade "for sale in Malta and possibly Libya."

Pursuant to 31 C.F.R. § 550.409, "[e]xports of goods ... from the United States to third countries are prohibited if the exporter knows, or has reason to know that ... [t]he goods are intended for transshipment to Libya ... without coming to rest in a third country...." Here, it is undisputed that L'anza intended that the products would come to rest in a third country, that is, Malta. Hence, L'anza did not violate the trade embargo against Libya and we reject Quality King's unclean hands defense.

## IV. *Standing*

█ Quality King asserts that L'anza lacked standing because it did not present copyright registration forms for a number of the products that were included in the shipments to Malta and that were ultimately imported by Quality King. A copyright owner wishing to bring an action for infringement must demonstrate that he has registered the work with the Copyright Office, or at least, deposited an application for registration with the appropriate fee to the Copyright Office. 17 U.S.C. § 411(a).

It is true that L'anza has not provided copyright registrations for some of the products that Quality King imported. However, L'anza's complaint did not necessarily allege violations with respect to these products. Rather, the only products listed by name in L'anza's complaint were: Super Quatre; Multi–Mist; Lavenda; Biotane; Vitro; Remede; Curls & Color Moisture Treatment; Curls and Color Moisturizing Shampoo; Re–Balance Leave–In Conditioner; Re–Balance Shampoo Plus; and Re–Balance Styling

Foam. Of these, the only product that is not included on Copyright Registration TXU 593–178 is Curls & Color Moisturizing Shampoo. In its supplemental excerpt of record, however, L'anza provided a copy of the copyright registration for this product as well, of which it requested judicial notice in the district court.

To the extent that L'anza's complaint may have purported to relate to products that were not included in Copyright Registration TXU 593–178,[5] the district court declined to exercise jurisdiction in its order of July 6, 1995. In that order, the district court held that "L'anza owns all right, title, and interest in U.S. copyright registration No. TXU 593–178." Thus, the district court only adjudicated the claim with respect to the products for which L'anza clearly had standing. L'anza also had standing with respect to all of the products covered by the district court's orders of July 25 and September 29, 1995. These orders included the products listed in copyright registration No. TXU 593–178 as well as Curls & Color Moisturizing Shampoo, for which L'anza presented a valid copyright registration. We therefore hold that L'anza has standing with respect to all of the products covered by the district court's orders.

## V. *Breadth of Permanent Injunction*

Quality King asserts that the district court's injunction must be reversed for several reasons: 1) because L'anza did not demonstrate a continued likelihood of infringement; 2) because the injunction forbids lawful behavior by enjoining even the importation of L'anza products *with* L'anza's authorization; 3) because it is difficult for Quality King to determine which products violate the injunction, given that imported products are not marked and Quality King may not be able to trace their origin. Quality King has failed to demonstrate that the district court abused its discretion or applied an erroneous legal stan-

---

5. L'anza's first amended complaint is vague as to which products it actually alleges copyright infringement, referring throughout the complaint to "L'anza products" and only listing specific products in a single paragraph:

Plaintiff is the exclusive maker and seller of L'anza hair care products in the United States and the remainder of the world. These prod-

ucts include, but are not limited to, the following L'anza hair care products: Super Quatre; Multi–Mist; Lavenda; Biotane; Vitro; Remede; Curls & Color Moisture Treatment; Curls & Color Moisturizing Shampoo; Re–Balance Leave–In Conditioner; Re–Balance Shampoo Plus; and Re–Balance Styling Foam.
[First Amended Complaint, I ER: 8]

dard. *See Dexter v. Kirschner,* 984 F.2d 979, 982 (9th Cir.1992).

### Continued Likelihood of Infringement

■ "[A]s a general rule, a copyright plaintiff is entitled to a permanent injunction when liability has been established and there is a threat of continuing violations." *Universal Studios, Inc. v. Sony Corp. of America,* 659 F.2d 963, 976 (9th Cir.1981), *rev'd on other grounds,* 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984); *see also* 3 Nimmer § 14.06[B] at 14–101 (1996). Here, L'anza presented evidence that Quality King still possessed L'anza products in its inventory and that it intended to sell them. Thus it appears that there is a threat of future infringement and the district court did not abuse its discretion.

### Lawful Behavior Enjoined

Quality King asserts that the injunction is overbroad because it enjoins Quality King from importing L'anza products with L'anza's permission. Because there appears to be little likelihood that L'anza would ever grant such permission to Quality King, this assertion is speculative and does not support Quality King's argument that the district court abused its discretion.

### Unfair Burden

■ Finally, Quality King argues that the injunction places an unfair burden on it because of the difficulty of determining the origin of particular L'anza products. In its support, it points to a Third Circuit decision in which the court held that "[b]road, nonspecific language that merely enjoins a party to obey the law or comply with an agreement ... does not give the restrained party fair notice of what conduct will risk contempt." *Epstein Family Partnership v. Kmart Corp.,* 13 F.3d 762, 771 (3d Cir.1994). Quality King's reliance upon the rule of *Epstein* is misplaced. There, the burden arose from the language of the injunction itself. Here, in contrast, it is not the vagueness of the injunction that gives rise to a burden. On the contrary, the injunction describes the enjoined conduct quite clearly. Instead, the burden arises from the difficulty of complying with the injunction, that is, the time and expense associated with determining the ori-gin of L'anza products before purchasing them. However, the injunction provides a mechanism for verifying that L'anza products are not illegally imported, according to which

> Quality King may send to L'anza any L'anza product in its original carton that it intends to buy, sell or dispose of and L'anza shall inform Quality King within ten days of receipt as to whether the particular L'anza product had previously been sold by L'anza within the United States.

Furthermore, Quality King has cited no authority for the proposition that an injunction is invalid if compliance is costly. Thus, we reject Quality King's argument that the injunction should be lifted because it is unduly burdensome.

### CONCLUSION

Quality King seeks reversal of the district court's grant of summary judgment and injunction in favor of L'anza Research International, arguing that L'anza's action under 17 U.S.C. § 602(a) is barred by the first sale doctrine and unclean hands. Moreover, it argues, L'anza did not establish that Quality King actually violated § 602(a). Finally, Quality King asserts that this court should reverse because L'anza lacks standing and the injunction is unduly burdensome.

We hold that the first sale doctrine does not bar liability under § 602(a) in this case. To hold otherwise would violate congressional intent. We also reject Quality King's arguments that 1) it did not violate § 602(a) in the first place; 2) L'anza's action is barred by unclean hands; and 3) L'anza lacked standing. Finally, we reject Quality King's arguments concerning the scope of the injunction.

AFFIRMED.