# QUALITY KING DISTRIBUTORS, INC. *v.* L'ANZA RESEARCH INTERNATIONAL, INC.

No. 96–1470.   Argued December 8, 1997—Decided March 9, 1998

136

STEVENS, J., delivered the opinion for a unanimous Court. GINSBURG, J., filed a concurring opinion, *post*, p. 154.

*Allen R. Snyder* argued the cause for petitioner. With him on the briefs were *Jonathan S. Franklin, William T. Rintala,* and *J. Larson Jaenicke.*

*Raymond H. Goettsch* argued the cause and filed a brief for respondent.

*Deputy Solicitor General Wallace* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Acting Solicitor General Waxman, Assistant Attorneys General Hunger* and *Klein, Patricia A. Millett, Michael Jay Singer,* and *Irene M. Solet.**

*Briefs of *amici curiae* urging reversal were filed for the American Free Trade Association by *Gilbert Lee Sandler* and *Jorge Espinosa;* for Cosco Companies, Inc., et al. by *Michael D. Sandler, Peter J. Kadzik, Rich-*

JUSTICE STEVENS delivered the opinion of the Court.

Section 106(3) of the Copyright Act of 1976 (Act), 17 U. S. C. § 106(3), gives the owner of a copyright the exclusive right to distribute copies of a copyrighted work. That exclusive right is expressly limited, however, by the provisions of §§ 107 through 120. Section 602(a) gives the copyright owner the right to prohibit the unauthorized importation of copies. The question presented by this case is whether the right granted by § 602(a) is also limited by §§ 107 through 120. More narrowly, the question is whether the "first sale" doctrine endorsed in § 109(a) is applicable to imported copies.

I

Respondent, L'anza Research International, Inc. (L'anza), is a California corporation engaged in the business of manufacturing and selling shampoos, conditioners, and other hair care products. L'anza has copyrighted the labels that are affixed to those products. In the United States, L'anza sells exclusively to domestic distributors who have agreed to resell within limited geographic areas and then only to authorized retailers such as barber shops, beauty salons, and professional hair care colleges. L'anza has found that the American "public is generally unwilling to pay the price charged for high quality products, such as L'anza's products, when they are sold along with the less expensive lower quality products that are generally carried by supermarkets and

ard Kelly, and Robert J. Verdisco; and for Jan-Bell Marketing, Inc., by Michael J. Gaertner.

Briefs of amici curiae urging affirmance were filed for the American Intellectual Property Law Association by Arthur J. Levine and John N. O'Shea; for the Beauty and Barber Supply Institute Inc. et al. by Deborah M. Lodge; for the National Consumers League et al. by Charles E. Buffon, Caroline M. Brown, Jan S. Amundson, Quentin Riegel, and Daniel F. O'Keefe, Jr.; for the Recording Industry Association of America et al. by Theodore B. Olson and Preeta D. Bansal; and for Swarovski America Limited by Werner Kronstein.

drug stores." App. 54 (declaration of Robert Hall). L'anza promotes the domestic sales of its products with extensive advertising in various trade magazines and at point of sale, and by providing special training to authorized retailers.

L'anza also sells its products in foreign markets. In those markets, however, it does not engage in comparable advertising or promotion; its prices to foreign distributors are 35% to 40% lower than the prices charged to domestic distributors. In 1992 and 1993, L'anza's distributor in the United Kingdom arranged the sale of three shipments to a distributor in Malta;[1] each shipment contained several tons of L'anza products with copyrighted labels affixed.[2] The record does not establish whether the initial purchaser was the distributor in the United Kingdom or the distributor in Malta, or whether title passed when the goods were delivered to the carrier or when they arrived at their destination, but it is undisputed that the goods were manufactured by L'anza and first sold by L'anza to a foreign purchaser.

It is also undisputed that the goods found their way back to the United States without the permission of L'anza and were sold in California by unauthorized retailers who had purchased them at discounted prices from Quality King Distributors, Inc. (petitioner). There is some uncertainty about the identity of the actual importer, but for the purpose of our decision we assume that petitioner bought all three shipments from the Malta distributor, imported them, and then resold them to retailers who were not in L'anza's authorized chain of distribution.

After determining the source of the unauthorized sales, L'anza brought suit against petitioner and several other defendants.[3] The complaint alleged that the importation and

---

[1] See App. 64 (declaration of Robert De Lanza).

[2] See id., at 70-83.

[3] L'anza's claims against the retailer defendants were settled. The Malta distributor apparently never appeared in this action and a default judgment was entered against it.

subsequent distribution of those products bearing copyrighted labels violated L'anza's "exclusive rights under 17 U. S. C. §§ 106, 501 and 602 to reproduce and distribute the copyrighted material in the United States." App. 32. The District Court rejected petitioner's defense based on the "first sale" doctrine recognized by § 109 and entered summary judgment in favor of L'anza. Based largely on its conclusion that § 602 would be "meaningless" if § 109 provided a defense in a case of this kind, the Court of Appeals affirmed. 98 F. 3d 1109, 1114 (CA9 1996). Because its decision created a conflict with the Third Circuit, see *Sebastian Int'l, Inc.* v. *Consumer Contacts (PTY) Ltd.*, 847 F. 2d 1093 (1988), we granted the petition for certiorari. 520 U. S. 1250 (1997).

## II

This is an unusual copyright case because L'anza does not claim that anyone has made unauthorized copies of its copyrighted labels. Instead, L'anza is primarily interested in protecting the integrity of its method of marketing the products to which the labels are affixed. Although the labels themselves have only a limited creative component, our interpretation of the relevant statutory provisions would apply equally to a case involving more familiar copyrighted materials such as sound recordings or books. Indeed, we first endorsed the first sale doctrine in a case involving a claim by a publisher that the resale of its books at discounted prices infringed its copyright on the books. *Bobbs-Merrill Co.* v. *Straus*, 210 U. S. 339 (1908).[4]

In that case, the publisher, Bobbs-Merrill, had inserted a notice in its books that any retail sale at a price under

---

[4] The doctrine had been consistently applied by other federal courts in earlier cases. See *Kipling* v. *G. P. Putnam's Sons,* 120 F. 631, 634 (CA2 1903); *Doan* v. *American Book Co.,* 105 F. 772, 776 (CA7 1901); *Harrison* v. *Maynard, Merrill & Co.,* 61 F. 689, 691 (CA2 1894); *Bobbs-Merrill Co.* v. *Snellenburg,* 131 F. 530, 532 (ED Pa. 1904); *Clemens* v. *Estes,* 22 F. 899, 900 (Mass. 1885); *Stowe* v. *Thomas,* 23 F. Cas. 201, 206–207 (ED Pa. 1853).

$1 would constitute an infringement of its copyright. The defendants, who owned Macy's department store, disregarded the notice and sold the books at a lower price without Bobbs-Merrill's consent. We held that the exclusive statutory right to "vend"[5] applied only to the first sale of the copyrighted work:

> "What does the statute mean in granting 'the sole right of vending the same'? Was it intended to create a right which would permit the holder of the copyright to fasten, by notice in a book or upon one of the articles mentioned within the statute, a restriction upon the subsequent alienation of the subject-matter of copyright after the owner had parted with the title to one who had acquired full dominion over it and had given a satisfactory price for it? It is not denied that one who has sold a copyrighted article, without restriction, has parted with all right to control the sale of it. The purchaser of a book, once sold by authority of the owner of the copyright, may sell it again, although he could not publish a new edition of it.

> "In this case the stipulated facts show that the books sold by the appellant were sold at wholesale, and purchased by those who made no agreement as to the control of future sales of the book, and took upon themselves no obligation to enforce the notice printed in the book, undertaking to restrict retail sales to a price of one dollar per copy." *Id.*, at 349–350.

The statute in force when *Bobbs-Merrill* was decided provided that the copyright owner had the exclusive right to "vend" the copyrighted work.[6] Congress subsequently cod-

---

[5] In 1908, when *Bobbs-Merrill* was decided, the copyright statute provided that copyright owners had "the sole liberty of printing, reprinting, publishing, completing, copying, executing, finishing, and *vending*" their copyrighted works. Copyright Act of 1891, §4952, 26 Stat. 1107 (emphasis added).

[6] See n. 5, *supra*.

ified our holding in *Bobbs-Merrill* that the exclusive right to "vend" was limited to first sales of the work.[7]   Under the 1976 Act, the comparable exclusive right granted in 17 U. S. C. § 106(3) is the right "to distribute copies . . . by sale or other transfer of ownership."[8]   The comparable limitation on that right is provided not by judicial interpretation, but by an express statutory provision.   Section 109(a) provides:

> "Notwithstanding the provisions of section 106(3), the owner of a particular copy or phonorecord lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord. . . ."[9]

---

[7] Congress codified the first sale doctrine in § 41 of the Copyright Act of 1909, ch. 320, 35 Stat. 1084, and again in § 27 of the 1947 Act, ch. 391, 61 Stat. 660.

[8] The full text of § 106 reads as follows:

"§ 106. Exclusive rights in copyrighted works

"Subject to sections 107 through 120, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:

"(1) to reproduce the copyrighted work in copies or phonorecords;

"(2) to prepare derivative works based upon the copyrighted work;

"(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

"(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;

"(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and

"(6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission."   17 U. S. C. § 106 (1994 ed., Supp. I).

[9] The comparable section in the 1909 and 1947 Acts provided that "nothing in this Act shall be deemed to forbid, prevent, or restrict the transfer

The *Bobbs-Merrill* opinion emphasized the critical distinction between statutory rights and contract rights.[10] In this case, L'anza relies on the terms of its contracts with its domestic distributors to limit their sales to authorized retail outlets. Because the basic holding in *Bobbs-Merrill* is now codified in § 109(a) of the Act, and because those domestic distributors are owners of the products that they purchased from L'anza (the labels of which were "lawfully made under this title"), L'anza does not, and could not, claim that the statute would enable L'anza to treat unauthorized resales by its domestic distributors as an infringement of its exclusive right to distribute copies of its labels. L'anza does claim, however, that contractual provisions are inadequate to protect it from the actions of foreign distributors who may resell L'anza's products to American vendors unable to buy from L'anza's domestic distributors, and that § 602(a) of the Act, properly construed, prohibits such unauthorized competition. To evaluate that submission, we must, of course, consider the text of § 602(a).

### III

The most relevant portion of § 602(a) provides:

> "Importation into the United States, without the authority of the owner of copyright under this title, of copies or phonorecords of a work that have been acquired outside the United States is an infringement of the exclu-

---

of any copy of a copyrighted work the possession of which has been lawfully obtained." Copyright Act of 1909, ch. 320, § 41, 35 Stat. 1084; see also Copyright Act of 1947, ch. 391, § 27, 61 Stat. 660. It is noteworthy that § 109(a) of the 1978 Act does not apply to "any copy"; it applies only to a copy that was "lawfully made under this title."

[10] "We do not think the statute can be given such a construction, and it is to be remembered that this is purely a question of statutory construction. There is no claim in this case of contract limitation, nor license agreement controlling the subsequent sales of the book." *Bobbs-Merrill Co.* v. *Straus*, 210 U. S. 339, 350 (1908).

sive right to distribute copies or phonorecords under section 106, actionable under section 501. . . ."[11]

It is significant that this provision does not categorically prohibit the unauthorized importation of copyrighted materials. Instead, it provides that such importation is an infringement of the exclusive right to distribute copies "under section 106." Like the exclusive right to "vend" that was construed in *Bobbs-Merrill*, the exclusive right to distribute is a limited right. The introductory language in § 106 expressly states that all of the exclusive rights granted by that section—including, of course, the distribution right granted by subsection (3)—are limited by the provisions of §§ 107 through 120.[12] One of those limitations, as we have noted, is provided by the terms of § 109(a), which expressly permit the owner of a lawfully made copy to sell that copy "[n]otwithstanding the provisions of section 106(3)."[13]

---

[11] The remainder of § 602(a) reads as follows:

"This subsection does not apply to—

"(1) importation of copies or phonorecords under the authority or for the use of the Government of the United States or of any State or political subdivision of a State, but not including copies or phonorecords for use in schools, or copies of any audiovisual work imported for purposes other than archival use;

"(2) importation, for the private use of the importer and not for distribution, by any person with respect to no more than one copy or phonorecord of any one work at any one time, or by any person arriving from outside the United States with respect to copies or phonorecords forming part of such person's personal baggage; or

"(3) importation by or for an organization operated for scholarly, educational, or religious purposes and not for private gain, with respect to no more than one copy of an audiovisual work solely for its archival purposes, and no more than five copies or phonorecords of any other work for its library lending or archival purposes, unless the importation of such copies or phonorecords is part of an activity consisting of systematic reproduction or distribution, engaged in by such organization in violation of the provisions of section 108(g)(2)."

[12] See n. 8, *supra*.

[13] See text accompanying n. 9, *supra*.

After the first sale of a copyrighted item "lawfully made under this title," any subsequent purchaser, whether from a domestic or from a foreign reseller, is obviously an "owner" of that item. Read literally, § 109(a) unambiguously states that such an owner "is entitled, without the authority of the copyright owner, to sell" that item. Moreover, since § 602(a) merely provides that unauthorized importation is an infringement of an exclusive right "under section 106," and since that limited right does not encompass resales by lawful owners, the literal text of § 602(a) is simply inapplicable to both domestic and foreign owners of L'anza's products who decide to import them and resell them in the United States.[14]

Notwithstanding the clarity of the text of §§ 106(3), 109(a), and 602(a), L'anza argues that the language of the Act supports a construction of the right granted by § 602(a) as "distinct from the right under Section 106(3) standing alone," and thus not subject to § 109(a). Brief for Respondent 15. Otherwise, L'anza argues, both the § 602(a) right itself and its exceptions[15] would be superfluous. Moreover, supported by various *amici curiae,* including the Solicitor General of the United States, L'anza contends that its construction is supported by important policy considerations. We consider these arguments separately.

## IV

L'anza advances two primary arguments based on the text of the Act: (1) that § 602(a), and particularly its three exceptions, are superfluous if limited by the first sale doctrine; and (2) that the text of § 501 defining an "infringer" refers

---

[14] Despite L'anza's contention to the contrary, see Brief for Respondent 26–27, the owner of goods lawfully made under the Act is entitled to the protection of the first sale doctrine in an action in a United States court even if the first sale occurred abroad. Such protection does not require the extraterritorial application of the Act any more than § 602(a)'s "acquired abroad" language does.

[15] See n. 11, *supra.*

separately to violations of § 106, on the one hand, and to imports in violation of § 602. The short answer to both of these arguments is that neither adequately explains why the words "under section 106" appear in § 602(a). The Solicitor General makes an additional textual argument: he contends that the word "importation" in § 602(a) describes an act that is not protected by the language in § 109(a) authorizing a subsequent owner "to sell or otherwise dispose of the possession of" a copy. Each of these arguments merits separate comment.

*The Coverage of § 602(a)*

Prior to the enactment of § 602(a), the Act already prohibited the importation of "piratical," or unauthorized, copies.[16] Moreover, that earlier prohibition is retained in § 602(b) of the present Act.[17] L'anza therefore argues (as do the Solicitor General and other *amici curiae*) that § 602(a) is superfluous unless it covers nonpiratical ("lawfully made") copies sold by the copyright owner, because importation nearly always implies a first sale. There are several flaws in this argument.

First, even if § 602(a) did apply only to piratical copies, it at least would provide the copyright holder with a private remedy against the importer, whereas the enforcement of § 602(b) is vested in the Customs Service.[18] Second, because the protection afforded by § 109(a) is available only to the "owner" of a lawfully made copy (or someone authorized by the owner), the first sale doctrine would not provide a de-

---

[16] See 17 U. S. C. §§ 106, 107 (1970).

[17] Section 602(b) provides in relevant part: "In a case where the making of the copies or phonorecords would have constituted an infringement of copyright if this title had been applicable, their importation is prohibited. . . ." The first sale doctrine of § 109(a) does not protect owners of piratical copies, of course, because such copies were not "lawfully made."

[18] See n. 17, *supra*.

fense to a §602(a) action against any nonowner such as a bailee, a licensee, a consignee, or one whose possession of the copy was unlawful.[19]   Third, §602(a) applies to a category of copies that are neither piratical nor "lawfully made under this title."   That category encompasses copies that were "lawfully made" not under the United States Copyright Act, but instead, under the law of some other country.

The category of copies produced lawfully under a foreign copyright was expressly identified in the deliberations that led to the enactment of the 1976 Act.   We mention one example of such a comment in 1961 simply to demonstrate that the category is not a merely hypothetical one.   In a report to Congress, the Register of Copyrights stated, in part:

> "When arrangements are made for both a U. S. edition and a foreign edition of the same work, the publishers frequently agree to divide the international markets. The foreign publisher agrees not to sell his edition in the United States, and the U. S. publisher agrees not to sell his edition in certain foreign countries.   It has been suggested that the import ban on piratical copies should be extended to bar the importation of the foreign edition in contravention of such an agreement."   Copyright Law Revision: Report of the Register of Copyrights on the General Revision of the U. S. Copyright Law, 87th Cong., 1st Sess., 125–126 (H. R. Judiciary Comm. Print 1961).

---

[19] In its opinion in this case, the Court of Appeals quoted a statement by a representative of the music industry expressing the need for protection against the importation of stolen motion picture prints: "We've had a similar situation with respect to motion picture prints, which are sent all over the world—legitimate prints made from the authentic negative. These prints get into illicit hands.   They're stolen, and there's no contractual relationship. . . . Now those are not piratical copies."   Copyright Law Revision Part 2: Discussion and Comments on Report of the Register of Copyrights on General Revision of the U. S. Copyright Law, 88th Cong., 1st Sess., 213 (H. R. Judiciary Comm. Print 1963) (statement of Mr. Sargoy), quoted in 98 F. 3d 1109, 1116 (CA9 1996).

Even in the absence of a market allocation agreement between, for example, a publisher of the United States edition and a publisher of the British edition of the same work, each such publisher could make lawful copies. If the author of the work gave the exclusive United States distribution rights—enforceable under the Act—to the publisher of the United States edition and the exclusive British distribution rights to the publisher of the British edition,[20] however, presumably only those made by the publisher of the United States edition would be "lawfully made under this title" within the meaning of § 109(a). The first sale doctrine would not provide the publisher of the British edition who decided to sell in the American market with a defense to an action under § 602(a) (or, for that matter, to an action under § 106(3), if there was a distribution of the copies).

The argument that the statutory exceptions to § 602(a) are superfluous if the first sale doctrine is applicable rests on the assumption that the coverage of that section is coextensive with the coverage of § 109(a). But since it is, in fact, broader because it encompasses copies that are not subject to the first sale doctrine—e. g., copies that are lawfully made under the law of another country—the exceptions do protect the traveler who may have made an isolated purchase of a copy of a work that could not be imported in bulk for purposes of resale. As we read the Act, although both the first sale doctrine embodied in § 109(a) and the exceptions in § 602(a) may

---

[20] A participant in a 1964 panel discussion expressed concern about this particular situation. Copyright Law Revision Part 4: Further Discussion and Comments on Preliminary Draft for Revised U. S. Copyright Law, 88th Cong., 2d Sess., 119 (H. R. Judiciary Comm. Print 1964) (statement of Mrs. Pilpel) ("For example, if someone were to import a copy of the British edition of an American book and the author had transferred exclusive United States and Canadian rights to an American publisher, would that British edition be in violation so that this would constitute an infringement under this section?"); see also id., at 209 (statement of Mr. Manges) (describing similar situation as "a troublesome problem that confronts U. S. book publishers frequently").

be applicable in some situations, the former does not subsume the latter; those provisions retain significant independent meaning.

*Section 501's Separate References to §§ 106 and 602*

The text of § 501 does lend support to L'anza's submission. In relevant part, it provides:

"(a) Anyone who violates any of the exclusive rights of the copyright owner as provided by sections 106 through 118 or of the author as provided in section 106A(a), or who imports copies or phonorecords into the United States in violation of section 602, is an infringer of the copyright or right of the author, as the case may be. ...."

The use of the words *"or who imports,"* rather than words such as *"including one who imports,"* is more consistent with an interpretation that a violation of § 602 is distinct from a violation of § 106 (and thus not subject to the first sale doctrine set out in § 109(a)) than with the view that it is a species of such a violation. Nevertheless, the force of that inference is outweighed by other provisions in the statutory text.

Most directly relevant is the fact that the text of § 602(a) itself unambiguously states that the prohibited importation is an infringement of the exclusive distribution right "under section 106, actionable under section 501." Unlike that phrase, which identifies § 602 violations as a species of § 106 violations, the text of § 106A, which is also cross-referenced in § 501, uses starkly different language. It states that the author's right protected by § 106A is "independent of the exclusive rights provided in Section 106." The contrast between the relevant language in § 602 and that in § 106A strongly implies that only the latter describes an independent right.[21]

---

[21] The strength of the implication created by the relevant language in § 106A is not diminished by the fact that Congress enacted § 106A more

Of even greater importance is the fact that the § 106 rights are subject not only to the first sale defense in § 109(a), but also to all of the other provisions of "sections 107 through 120." If § 602(a) functioned independently, none of those sections would limit its coverage. For example, the "fair use" defense embodied in § 107[22] would be unavailable to importers if § 602(a) created a separate right not subject to the limitations on the § 106(3) distribution right. Under L'anza's interpretation of the Act, it presumably would be unlawful for a distributor to import copies of a British newspaper that contained a book review quoting excerpts from an American

recently than § 602(a), which is part of the Copyright Act of 1976. Section 106A was passed as part of the Visual Artists Rights Act of 1990 in order to protect the moral rights of certain visual artists. Section 106A is analogous to Article 6*bis* of the Berne Convention for the Protection of Literary and Artistic Works, but its coverage is more limited. See 2 P. Goldstein, Copyright § 5.12, p. 5:225 (2d ed. 1996) (§ 106A encompasses aspects of the moral rights guaranteed by Article 6*bis* of the Berne Convention, "but effectively gives these rights a narrow subject matter and scope").

[22] Title 17 U. S. C. § 107 provides as follows:

"§ 107. Limitations on exclusive rights: Fair use

"Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

"(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

"(2) the nature of the copyrighted work;

"(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

"(4) the effect of the use upon the potential market for or value of the copyrighted work.

"The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors."

novel protected by a United States copyright.[23]   Given the importance of the fair use defense to publishers of scholarly works, as well as to publishers of periodicals, it is difficult to believe that Congress intended to impose an absolute ban on the importation of all such works containing any copying of material protected by a United States copyright.

In the context of this case, involving copyrighted labels, it seems unlikely that an importer could defend an infringement as a "fair use" of the label.   In construing the statute, however, we must remember that its principal purpose was to promote the progress of the "useful Arts," U. S. Const., Art. I, § 8, cl. 8, by rewarding creativity, and its principal function is the protection of original works, rather than ordinary commercial products that use copyrighted material as a marketing aid.   It is therefore appropriate to take into account the impact of the denial of the fair use defense for the importer of foreign publications.   As applied to such publications, L'anza's construction of § 602 "would merely inhibit access to ideas without any countervailing benefit." *Sony Corp. of America* v. *Universal City Studios, Inc.,* 464 U. S. 417, 450–451 (1984).[24]

*Does an importer "sell or otherwise dispose" of copies as those words are used in § 109(a)?*

Whether viewed from the standpoint of the importer or from that of the copyright holder, the textual argument advanced by the Solicitor General[25]—that the act of "im-

---

[23] The § 602(a) exceptions, which are substantially narrower than § 107, would not permit such importation.   See n. 11, *supra.*

[24] L'anza's reliance on § 602(a)(3)'s reference to § 108(g)(2), see n. 11, *supra,* to demonstrate that all of the *other* limitations set out in §§ 107 through 120—including the first sale and fair use doctrines—do not apply to imported copies is unavailing for the same reasons.

[25] See also Brief for Recording Industry Association of America et al. 19–21.

portation" is neither a sale nor a disposal of a copy under § 109(a)—is unpersuasive. Strictly speaking, an importer could, of course, carry merchandise from one country to another without surrendering custody of it. In a typical commercial transaction, however, the shipper transfers "possession, custody, control and title to the products"[26] to a different person, and L'anza assumes that petitioner's importation of the L'anza shipments included such a transfer. An ordinary interpretation of the statement that a person is entitled "to sell or otherwise dispose of the possession" of an item surely includes the right to ship it to another person in another country.

More important, the Solicitor General's cramped reading of the text of the statutes is at odds not only with § 602(a)'s more flexible treatment of unauthorized importation as an infringement of the distribution right (even when there is no literal "distribution"), but also with the necessarily broad reach of § 109(a). The whole point of the first sale doctrine is that once the copyright owner places a copyrighted item in the stream of commerce by selling it, he has exhausted his exclusive statutory right to control its distribution. As we have recognized, the codification of that doctrine in § 109(a) makes it clear that the doctrine applies only to copies that are "lawfully made under this title," but that was also true of the copies involved in the *Bobbs-Merrill* case, as well as those involved in the earlier cases applying the doctrine. There is no reason to assume that Congress intended either § 109(a) or the earlier codifications of the doctrine to limit its broad scope.[27]

In sum, we are not persuaded by either L'anza's or the Solicitor General's textual arguments.

---

[26] App. 87.

[27] See, *e. g.,* H. R. Rep. No. 1476, 94th Cong., 2d Sess., 79 (1979) ("Section 109(a) restates and confirms" the first sale doctrine established by prior case law); S. Rep. No. 473, 94th Cong., 1st Sess., 71 (1975) (same).

## V

The parties and their *amici* have debated at length the wisdom or unwisdom of governmental restraints on what is sometimes described as either the "gray market" or the practice of "parallel importation."[28]   In *K mart Corp.* v. *Cartier, Inc.*, 486 U. S. 281 (1988), we used those terms to refer to the importation of foreign-manufactured goods bearing a valid United States trademark without the consent of the trademark holder.   *Id.*, at 285–286.   We are not at all sure that those terms appropriately describe the consequences of an American manufacturer's decision to limit its promotional efforts to the domestic market and to sell its products abroad at discounted prices that are so low that its foreign distributors can compete in the domestic market.[29]   But even if they do, whether or not we think it would be wise policy to provide statutory protection for such price discrimination is not a matter that is relevant to our duty to interpret the text of the Copyright Act.

Equally irrelevant is the fact that the Executive Branch of the Government has entered into at least five international trade agreements that are apparently intended to protect domestic copyright owners from the unauthorized importation of copies of their works sold in those five countries.[30]   The earliest of those agreements was made in 1991; none has been ratified by the Senate.   Even though they are of course

---

[28] Compare, for example, Gorelick & Little, The Case for Parallel Importation, 11 N. C. J. Int'l L. & Comm. Reg. 205 (1986), with Gordon, Gray Market Is Giving Hair-Product Makers Gray Hair, N. Y. Times, July 13, 1997, section 1, p. 28, col. 1.

[29] Presumably L'anza, for example, could have avoided the consequences of that competition either (1) by providing advertising support abroad and charging higher prices, or (2) if it was satisfied to leave the promotion of the product in foreign markets to its foreign distributors, to sell its products abroad under a different name.

[30] The Solicitor General advises us that such agreements have been made with Cambodia, Trinidad and Tobago, Jamaica, Ecuador, and Sri Lanka.

consistent with the position taken by the Solicitor General in this litigation, they shed no light on the proper interpretation of a statute that was enacted in 1976.[31]

The judgment of the Court of Appeals is reversed.

*It is so ordered.*

JUSTICE GINSBURG, concurring.

This case involves a "round trip" journey, travel of the copies in question from the United States to places abroad, then back again. I join the Court's opinion recognizing that we do not today resolve cases in which the allegedly infringing imports were manufactured abroad. See W. Patry, *Copyright Law and Practice* 166–170 (1997 Supp.) (commenting that provisions of Title 17 do not apply extraterritorially unless expressly so stated, hence the words "lawfully made under this title" in the "first sale" provision, 17 U. S. C. § 109(a), must mean "lawfully made in the United States"); see generally P. Goldstein, Copyright § 16.0, pp. 16:1–16:2 (2d ed. 1998) ("Copyright protection is territorial. The rights granted by the United States Copyright Act extend no farther than the nation's borders.").

---

[31] We also note that in 1991, when the first of the five agreements was signed, the Third Circuit had already issued its opinion in *Sebastian Int'l, Inc.* v. *Consumer Contacts (PTY) Ltd.*, 847 F. 2d 1093 (1988), adopting a position contrary to that subsequently endorsed by the Executive Branch.