CHICAGO SCHOOL REFORM BOARD OF TRUSTEES, an Illinois Municipal Corporation, Plaintiff,

v.

SUBSTANCE, INC., an Illinois Corporation; George N. Schmidt, individually; Jane or John Does (One through Twenty), individually, and Volumes XXIV, Nos. 5 and 6 of Substance (January–February, 1999), in rem, Defendants.

Substance, Inc., an Illinois Corporation; and George N. Schmidt, Third–Party Plaintiffs,

v.

Paul Vallas, Chief Executive Officer, Chicago Public Schools, in his official capacity, Third–Party Defendant.

No. 99 C 440.

United States District Court, N.D. Illinois, Eastern Division.

Jan. 4, 2000.

**920**

Patricia Anne Felch, Laura J. DeMoor, Gilberto Hernandez, Banner & Witcoff, Ltd., Chicago, IL, Joshua Lee Smith, Peterson & Ross, Chicago, IL, Edmund Sebree McAlister, Sachnoff & Weaver, Ltd., Chicago, IL, for Chicago School Reform Board of Trustees, an Illinois municipal corporation, plaintiff.

Jeffrey Charles Boulden, Despres Schwartz & Geoghegan, Chicago, IL, Alan Barinholtz, Barinholtz & Gault, Chicago, IL, Mark H. Barinholtz, Chicago, IL, for defendants.

Laura J. DeMoor, Gilberto Hernandez, Banner & Witcoff, Ltd., Chicago, IL, for Paul Vallas, third-party defendant.

## OPINION and ORDER

NORGLE, District Judge.

Plaintiff Chicago School Reform Board of Trustees and Third–Party Defendant Paul Vallas move to dismiss Defendants' Counterclaim and Third–Party Complaint and to strike three of Defendants' Affirmative Defenses. For the following reasons, the court grants the motion.

## I. Background [1]

The Illinois Common Schools Act empowers the Plaintiff in this case, the Chicago School Reform Board of Trustees ("the Board"), to develop and administer educational level tests. *See* 105 ILCS §§ 5/34–2.4, 5/34–3.3. Pursuant to this authority, the Board developed the 1998 Chicago Academic Standards Examinations ("CASE" or "tests"). The Board designed the tests to assess the educational levels of Chicago Public High School freshman and sophomore students, and to calculate up to 20% of a student's grade in various academic subjects. The Board expected to use the tests, 22 in all, in 1999 and in future years. (*See* Am.Compl. ¶ 13.)

According to the Board, the tests cost approximately $1.3 million to develop. Of this cost, the John D. and Catherine T. MacArthur Foundation contributed $500,-000 from a fund that was "dedicated to pay for the professional testing design services of the Center for Research on Evaluation, Standards, and Student Testing [and] to assist [the Board] in designing CASE." (*Id.* ¶ 10.) Illinois taxpayers funded the remaining $800,000. (*See id.*)

To protect its interest in the tests, the Board included a copyright notice on each of the 22 tests. That notice reads:

© 1998 Chicago School Reform Board of Trustees

(Answer ¶ 17.) Each of the tests also contains the following restriction:

This work may not be reproduced in any form or by any means (electronic, including photography, recording, or any information storage and retrieval) without prior permission in writing from the Chicago Public Schools.

(*Id.*) Additionally, the Board implemented the "Chicago Public Schools Test Security Guidelines," which required the Guidelines to be distributed to all staff members who handle test materials. These Guidelines, as well as the CASE General Administration Policies, expressly prohibit copying the CASE examinations.

The Board administered the tests to students from January 11, 1999 through January 15, 1999. (*Id.*) Defendant George Schmidt ("Schmidt"), a Chicago Public School teacher and editor of Defendant newspaper *Substance, Inc.* ("*Substance* "),[2] helped administer the January 1999 test for freshman English. (*See id.* ¶ 22.) Prior to administering the test, Schmidt received a copy of a booklet entitled "Instructions for Administering the CASE Constructed Response and Multiple Choice Examination." (*See id.* ¶ R4.) The Instructions state in large, bold type: **"According to the Test Security Guidelines, CASE material may not be duplicated."** (*Id.* ¶ 25.)

During the week of January 11, 1999, Schmidt asked Bowen High School's CASE coordinator, Judy Wiatrowski, for copies of an unspecified number of tests for subject areas other than freshman English. Wiatrowski provided him the requested copies, and Schmidt returned them to her shortly thereafter. However, in their Counterclaim and Third Party Complaint (collectively "Counterclaims"), Schmidt and *Substance* ("Defendants") maintain that "[i]n January 1999, [they] received, through anonymous sources, copies of some of the [CASE] pilot B Examinations." (Countercl.¶ 13.)[3] Defendants

1. The court compiles the background facts from the Amended Verified Complaint, Answer, and pleadings and notes that "[a]verments in a pleading to which a responsive pleading is required ..., are admitted when not denied in the responsive pleading." Fed. R.Civ.P. 8(d); *see also* Fed.R.Civ.P. 8(b). Disputed points are noted in the text.

2. Defendants state that *Substance* currently has 1,250 subscribers and publishes approximately 3,000 copies monthly (*see* Counter-

claims ¶ 10.) *Substance's* primary purpose is to inform the public of educational issues, including matters relating to the Chicago Public Schools. (*See id.* ¶ 11–12.)

3. Defendants attached their Affirmative Defenses and Counterclaims to their Answer at pages 26 and 27–32, respectively. For clarity, the court will cite to the Affirmative Defenses and Counterclaims when referring to those pleadings and not to the Answer.

assert that an anonymous source left one test on *Substance's* doorstep, although the court notes that Defendants share the same address. (*See id.*) Defendants also claim that several other tests were delivered in plain envelopes to *Substance's* mailbox. (*See id.*) On or before January 21, 1999, Schmidt published, in the January–February, 1999 issue of *Substance* (Volumes XXIV, Nos. 5 and 6), entire copies of five of the tests and a substantial portion of a sixth. (*See* Answer ¶ 27.) In two of the test reproductions, Schmidt included the copyright notice and the "no reproduction" restriction. (*See id.* ¶ 28.) As for the other four reproductions, Schmidt deleted the copyright notice and the "no reproduction" restriction. (*See id.*) In the same issue of *Substance* that included copies of the tests, Schmidt criticized the tests.

On January 26, 1999, the Board filed a verified Complaint against Schmidt, *Substance*, Jane or John Does (One through Twenty), and Volumes XXIV, Nos. 5 and 6 of *Substance* (January–February, 1999), *in rem.* Also on January 26, 1999, the Board moved for a Temporary Restraining Order and Writ of Seizure to restrain Defendants from copying or disseminating any of the CASE tests in any format, and to give up for seizure any and all copies of Substance Volume XXIV, Nos. 5–6 (January–February 1999). The court granted the Board's motion on the same day. On February 1, 1999, the Board sought to extend the temporary restraining order. The court denied the Board's request.

On February 5, 1999, the Board filed an Amended Verified Complaint. Count I alleges that Defendants published the Board's copyrighted literary works, *see* 17 U.S.C. § 102(a)(1), and thus violated the United States Copyright Act ("Copyright Act"), 17 U.S.C. §§ 101 *et seq.*, and Count II claims that Defendants misappropriated trade secrets in violation of Illinois' trade secret statutes, 765 ILCS §§ 1065/1 *et seq.* (*See* Am.Compl. at 8–14.) The Board maintains that by publishing the tests, Defendants divulged confidential materials and destroyed the Board's future use of the tests. The Board asserts that developing more tests to replace the now-unusable tests will cost in excess of $1,000,000. (*See id.* ¶ 49.) The Board asks the court (1) to enjoin Defendants from continuing to publish and deliver issues of *Substance* which contain reproductions of the tests; (2) to order the seizure and destruction of all copies of *Substance* in which the tests were reproduced; (3) to report the conduct of Defendants and other "Teacher–Publishers" to the United States Attorney for the Northern District of Illinois, Eastern Division, pursuant to section 506 of the Copyright Act; (4) to award the Board damages, attorneys fees and costs, pursuant to the Copyright Act; (5) to award the Board damages, punitive damages, attorneys fees and costs, and prejudgment interest pursuant to the Illinois Trade Secrets Act; and (6) for other relief the court deems appropriate. (*See id.* at 14–18.)

On February 23, 1999, the court entered the parties' agreed protective order, requiring Defendants to deliver all copies of the tests and all copies of Substance that contained reproductions of the tests to the Board. (*See* Agreed Protective Order ¶ 12.) Defendants also agreed to make no new copies of the tests until further court order. (*See id.* ¶ 13.) In the meantime, the Board transferred Schmidt from his teaching position to an administrative position, and then, on March 5, 1999, suspended him without pay pending an Illinois State Board of Education hearing regarding his termination. (*See* Counterclaims ¶ 16.)

On April 2, 1999, Defendants answered the Amended Verified Complaint. In their Answer, Defendants assert the following affirmative defenses: (1) Counts I and II fail to allege valid claims under Federal Rule of Civil Procedure 12(b)(6); (2) Defendants' reproductions of the tests are privileged under the doctrine of fair use, 17 U.S.C. § 107; (3) Defendants' reproductions of the tests are privileged under the First and Fourteenth Amendments; (4) Defendants' reproductions of the tests

are privileged by the "Free Speech and Press provisions of applicable state constitutions"; (5) the Board's action is barred by estoppel; (6) the Board's action is barred by waiver; and (7) the Board's action is barred by laches. (*See* Answer at 26.)

In the same pleading, Defendants filed their Counterclaims, pursuant to 42 U.S.C. § 1983. *See* Counterclaims reproduced *infra* p. 34. In those Counterclaims, Defendants allege that the Board's participation in the decision-making process regarding Schmidt's employment and its filing of the instant suit violates Defendants' substantive due process rights under the First and Fourteenth Amendments.[4] (*See* Countercl. ¶ 19–21.) Additionally, Defendants add Paul Vallas, Chief Executive Officer of the Chicago Public Schools, in his official capacity, as a third-party defendant. (*See* Countercl. ¶ 3.) Defendants ask the court to: (1) declare the actions of the Board and Vallas violative of the First Amendment; (2) enjoin the Board and Vallas from taking future discriminatory employment action against Schmidt; (3) return Schmidt to his job as a Chicago Public School teacher; and (4) award Schmidt punitive damages of over $1,000,000. (*See* Countercl. at 31.)

On May 10, 1999, the Board and Vallas moved to dismiss Defendants' Counterclaim and Third–Party Claims and moved to strike Defendants' Second, Third, and Fourth Affirmative Defenses (from this point forward, the court refers to both movants simply as "the Board"). The Board argues that the court should dismiss: (1) Defendants' Counterclaim for failing to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) because the First Amendment does not protect copyright infringement; (2) Defendants' Counterclaim and Third–Party Complaint to the extent that they allege violations of Schmidt's due process rights under the Fourteenth Amendment because they fail

to state claims under Rule 12(b)(6); and (3) Defendants' Third–Party Complaint against Vallas, in his official capacity, because Defendants improperly named him as a third-party defendant. (*See* Mem. in Supp. at 8.) The Board also asks the court to strike Defendants' Second, Third, and Fourth Affirmative Defenses because the First Amendment does not protect copyright infringement, and because Defendants cannot show that their use of the tests is a fair use under the Copyright Act. (*See id.* at 5.)

In their Memorandum in Opposition to the Motion to Dismiss, Defendants admit that "Defendant *Substance* has published a small portion of plaintiff's copyrighted Work." (Mem. in Opp. at 3); (*see also* Mem. in Opp. at 13) ("[Defendants'] First Amendment rights to publish a newspaper are paramount to the Board's asserted copyright and thus avoid the normal legal consequences for a copyright violation.") Defendants argue, however, that "[t]his dispute centers around whether [the Board] may use the federal Copyright Act as a means to suppress public access to and debate over purported standardized tests . . . ." (Mem. in Opp. at 3.) Defendants proceed to address the First Amendment/Copyright issue only as it applies to their Second, Third, and Fourth Affirmative Defenses, because "[the Board's] Motion and Memorandum . . . raise issues that seem, at least to Defendants, to call into question the legal sufficiency of certain of Defendants' Affirmative Defenses." (Mem. in Opp. at 2.) Defendants then apparently argue that their Counterclaims state a First Amendment violation claim because even if Defendants violated the copyright laws, the Board violated Schmidt's First Amendment rights by taking disciplinary action against Schmidt. (*See* Mem. in Opp. at 12–15.) Defendants also state that their use of the tests is a fair use, (*see* Mem. in Opp. at 8), and

---

4. In its Motion to Dismiss, the Board assumed that Defendants assert procedural due process violations in their Counterclaims. However, in their Memorandum in Opposi-

tion, Defendants clarify that they allege substantive, and not procedural, due process violations. (*See* Mem. in Opp. at 15.)

maintain that the Board cannot discipline Schmidt because his actions constituted speech on a matter of public concern. (*See* Mem. in Opp. at 14.) Next, Defendants contend that their Counterclaims state a violation of their substantive due process rights, and that "it was necessary for [Defendants] to plead the First Amendment rights as also being Fourteenth Amendment rights, redress for which is sought through § 1983." (*See* Mem. in Opp. at 16.) With regard to naming Vallas as a third-party defendant, Defendants admit they mistakenly failed to name him in his individual capacity in their Third–Party Complaint. (*See* Mem in Opp. at 16.) Nevertheless, Defendants argue that because they ask the court to order Vallas, as well as the Board, to reinstate Schmidt as a Chicago Public School teacher, Defendants properly named Vallas in his official capacity. (*See* Mem. in Opp. at 16.) After the Board replied to Defendants' Response, Defendants filed a Sur-reply.

## II. Discussion

### A. Motion to Dismiss Standard

When reviewing a motion to dismiss under Rule 12(b)(6), the court merely looks at the sufficiency of the complaint, *Autry v. Northwest Prem. Servs., Inc.,* 144 F.3d 1037, 1039 (7th Cir.1998); it does not decide whether the plaintiff has a winning claim. *Herdrich v. Pegram, M.D.,* 154 F.3d 362, 369 (7th Cir.1998). Accordingly, "[a] complaint may not be dismissed unless 'it is impossible to prevail under any set of facts that could be proved consistent with the allegations.'" *Moriarty v. Lewis Funeral Directors, Ltd.,* 150 F.3d 773, 777 (7th Cir.1998) (*quoting Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)); *see also Marshall–Mosby v. Corporate Receiv., Inc.,* 194 F.3d 830, 833 (7th Cir.1999) ("Dismissal under Rule 12(b)(6) is proper only where the plaintiff can prove no set of facts that would entitle him to relief."). The court "must look to see whether there is any possible interpretation of the complaint under which it can state a claim." *Martinez v. Hooper,* 148 F.3d 856, 858 (7th Cir.

1998); *see also Sanjuan v. American Bd. of Psychiatry and Neurology, Inc.,* 40 F.3d 247, 251 (7th Cir.1994) ("At this stage, the plaintiff receives the benefit of imagination, so long as the hypotheses are consistent with the complaint."). "Complaints need not plead law or match facts to every element of a legal theory...." *Bennett v. Schmidt,* 153 F.3d 516, 518 (7th Cir.1998). "Matching facts against legal elements comes later." *Sanjuan,* 40 F.3d at 251. The court will deny a Rule 12(b)(6) motion to dismiss where the defendant merely "attempts to nit-pick the complaint to death." *LaSalle v. Medco Research, Inc.,* 54 F.3d 443, 447 (7th Cir.1995).

However, the Seventh Circuit has also stated that "[a] complaint must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Herdrich,* 154 F.3d at 369. "'It is true that the Federal Rules of Civil Procedure do not require a plaintiff to set out in detail the facts upon which a claim is based. Nevertheless, a plaintiff must allege sufficient facts to outline a cause of action, proof of which is essential to recovery.'" *Stevens v. Umsted,* 131 F.3d 697, 700 (7th Cir.1997) (*quoting Ellsworth v. City of Racine,* 774 F.2d 182, 184 (7th Cir.1985)). In other words, "[w]hile federal notice-pleading allows for a generous reading of a complaint, in order to resist a motion to dismiss, the complaint must at least set out facts sufficient to 'outline or adumbrate' the basis of the claim." *Panaras v. Liquid Carbonic Indust. Corp.,* 74 F.3d 786, 792 (7th Cir.1996). For instance, "attaching a bare legal conclusion to the facts" will not suffice. *Id.* Moreover, although "[a] complaint may not be dismissed under Fed.R.Civ.P. 12(b)(6) just because it omits factual allegations ... it may be dismissed when the plaintiffs make it clear that they do not plan to prove an essential element of their case." *La Porte County Republican Cent. Comm. v. Bd. of Commiss.,* 43 F.3d 1126, 1129 (7th Cir. 1994). With these principles in mind, the

court turns to the Board's Motion to Dismiss.

*B. The First Amendment Does Not Protect Copyright Violators*

■ Section 106 of the Copyright Act outlines the rights of owners of copyrighted materials:

Subject to sections 107 through 121, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:

(1) to reproduce the copyrighted work in copies or phonorecords;

(2) to prepare derivative works based upon the copyrighted work;

(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;

(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and

(6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

17 U.S.C. § 106.[5] Because Defendants admit that "Defendant *Substance* has published a small portion of plaintiff's copyrighted Work[,]" (*see* Mem. in Opp. at 3), they admit they infringed upon the Board's exclusive right to reproduce the copyrighted tests, and thus violated § 106(1) of the Copyright Act. *See* 17 U.S.C. § 106(1). Thus, the issue before the court is quite narrow: Whether the First Amendment permits a Chicago Public School teacher to publish, in his own for-profit newspaper, copyrighted tests as a means to generate public debate over the tests' validity. The court finds that the First Amendment affords no such protection.

■ The First Amendment provides: "Congress shall make no law ... abridging the freedom of speech, or of the press...." U.S. Const. amend. I. And while "[g]reat responsibility is ... placed upon the news media to report fully and accurately the proceedings of government," *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 491–492, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975); *see also Wilson v. Layne*, 526 U.S. 603, 119 S.Ct. 1692, 1698, 143 L.Ed.2d 818 (1999), the First Amendment's freedoms are not boundless. Indeed, in *Cohen v. Cowles Media Co.*, 501 U.S. 663, 111 S.Ct. 2513, 115 L.Ed.2d 586 (1991), the Supreme Court iterated that it has repeatedly recognized that "generally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news." *Id.* at 669–70, 111 S.Ct. 2513 (*citing Branzburg v. Hayes*, 408 U.S. 665, 684, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972) (press must respond to grand jury subpoenas); *Zacchini v. Scripps–Howard Broadcasting Co.*, 433 U.S. 562, 576–579, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977) (press must obey copyright laws); *Associated Press v. NLRB*, 301 U.S. 103, 57 S.Ct. 650, 81 L.Ed. 953 (1937) (media must obey the National Labor Relations Act); *Oklahoma Press Pub Co. v. Walling*, 327 U.S. 186, 192–193, 66 S.Ct. 494, 90 L.Ed. 614 (1946) (press must obey the Fair Labor Standards Act); *Associated Press v. United States*, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945) (press may not restrain trade in violation of the antitrust laws); *Citizen Publ. Co. v. United States*, 394 U.S. 131,

---

**5.** The court notes that the Copyright Act's principal purpose is to promote the progress of the "useful Arts" by rewarding creative activity. *See Quality King Dist., Inc. v. L'anza Research Int'l, Inc.*, 523 U.S. 135, 118 S.Ct. 1125, 1133, 140 L.Ed.2d 254 (1998). Nevertheless, the Act's protections clearly apply to the case at bar.

139, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969) (same); *Murdock v. Pa.*, 319 U.S. 105, 112, 63 S.Ct. 870, 87 L.Ed. 1292 (1943) (press must pay non-discriminatory taxes); *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 581–583, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983) (same)).[6]

In *Cohen*, a confidential source of information sued two newspapers under a promissory estoppel theory after the newspapers broke their promises to the source not to publish his identity. *See id.* at 665–66, 111 S.Ct. 2513. In addressing the press's First Amendment rights, the Court stated:

> It is ... beyond dispute that "[t]he publisher of a newspaper has no special immunity from the application of general laws. He has no special privilege to invade the rights and liberties of others." *Associated Press v. NLRB, supra*, 301 U.S., at 132–133, 57 S.Ct., at 655–656. Accordingly, enforcement of such general laws against the press is not subject to stricter scrutiny than would be applied to enforcement against other persons or organizations.

*Id.* at 670, 111 S.Ct. 2513. The Court held that the First Amendment does not forbid Minnesota's promissory estoppel law from applying to the press. *See id.*

Importantly, the Court plainly stated that, like Minnesota's promissory estoppel law, copyright law is a "generally applicable law" that limits First Amendment freedoms: "The press, like others interested in publishing, may not publish copyrighted material without obeying the copyright laws." *Id.* (*citing Zacchini*, 433 U.S. at 576–79, 97 S.Ct. 2849 (holding that the First and Fourteenth Amendments do not immunize the media when they broadcast

a performer's entire act, in Zacchini's case, a "human cannonball" act, without performer's consent)); *see also San Francisco Arts and Athletics v. Olympic Committee*, 483 U.S. 522, 541, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987) (holding that organization had no First Amendment right of expression to appropriate the word "Olympic" for use in the term "Gay Olympic Games"); *Branzburg*, 408 U.S. at 684, 92 S.Ct. 2646 ("First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally"); *Dallas Cowboys Cheerleaders, Inc. v. Scoreboard Posters, Inc.*, 600 F.2d 1184, 1188 (5th Cir.1979) ("[t]he first amendment is not a license to trammel on legally recognized rights in intellectual property").

Defendants offer few reasons why the principles of *Cohen*, 501 U.S. at 669, 111 S.Ct. 2513; *Zacchini*, 433 U.S. at 576–79, 97 S.Ct. 2849; *San Francisco Arts*, 483 U.S. at 541, 107 S.Ct. 2971; *Branzburg*, 408 U.S. at 684, 92 S.Ct. 2646; and *Dallas Cowboys Cheerleaders*, 600 F.2d at 1188 do not apply to the current case, and none are persuasive. For example, Defendants state that they "do not agree with the general principles emphasized by this Court and extracted from the *Cohen* and *Branzburg* decisions [in the court's Order of February 3, 1999], but suggest that those principles do not exclude, by any means, the First Amendment claims and defenses made by defendants under the unique facts presented here." (Mem. in Opp. at 10.) Defendants' wholly unsupported "suggestion" fails to demonstrate why the principles of *Cohen* and *Branzburg* do not apply "under the unique facts presented here." (*Id.*) Furthermore, Defendants' contention that their position is

---

**6.** As an aside, the court notes that the traditional defenders of First Amendment freedoms, the press, themselves rely on the Copyright Act's protections. For example, in its January 3, 2000 issue, the *Chicago Tribune* inserts the line "153 Year—No. 3 © Chicago Tribune 6 Sections" just beneath the newspaper's front-page heading, and on page four states, "Copyright © 1999 Chicago Tribune

Company. All rights reserved as to the entire content. Chicago Tribune is a registered trademark." *Chicago Tribune*, January 3, 2000, at 1, 4. The January 3, 2000 issue of the *Chicago Sun–Times* states, "The Chicago Sun–Times Vol. 53, No. 285 © 1999 (UPS No. 103–920) is published daily ... by Chicago Sun–Times, Inc...." *Chicago Sun–Times*, January 3, 2000, at 2.

somehow tenable because they "are not disobeying the copyright laws[.]" (Mem. in Opp. at 10) is inconsistent with their admission that "*Substance* has published a small portion of plaintiff's copyrighted Work." (Mem. in Opp. at 3.) In short, Defendants offer nothing to show that the court should not follow *Cohen* and the other cases cited above.

Defendants' attempts to factually distinguish the cases above (*see* Mem. in Opp. at 8–12) also fail to convince the court that the principles cited therein are inapplicable to the case at bar. For example, Defendants argue that because the *Cohen* court addressed the press's First Amendment rights as they related to a promissory estoppel claim, *Cohen* cannot apply to a First Amendment/copyright case. (*See* Mem. in Opp. at 10.) Given *Cohen*'s general principle that "[t]he publisher of a newspaper has no special immunity from the application of general laws[,]" *Cohen,* 501 U.S. at 670, 111 S.Ct. 2513, and, more specifically, that "the press ... may not publish copyrighted material without obeying the copyright laws[,]" *id.,* the court declines to read *Cohen* as narrowly as Defendants argue.

Likewise, Defendants contend that the Supreme Court's statement in *Branzburg* that the "First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally" is inapplicable here because *Branzburg* did not involve a copyright violation. (*See* Mem. in Opp. at 10.) Indeed, the *Branzburg* Court discussed whether requiring newsmen to appear and testify before state or federal grand juries abridges the First Amendment's right freedom of speech and press; and the Court found it did not. *See Branzburg,* 408 U.S. at 667, 92 S.Ct. 2646. Nevertheless, this distinction does not render *Branzburg* inapplicable.

Defendants also cite numerous cases to support the contention that the First Amendment guarantees their right to publish copyrighted tests. However, Defendants fail to provide any argument or analysis to demonstrate how or why these cases apply in the instant cause of action. For example, Defendants cite to several cases to support the general contention that, under certain circumstances, the First Amendment may allow copyright infringement. (*See* Resp. at 2) (*citing Belmore v. City Pages, Inc.,* 880 F.Supp. 673, 680 (D.Minn.1995) (holding that the fair use doctrine entitled a newspaper to publish a fable that was written by a police officer in order to critique the unique fable and the police department); *Time, Inc. v. Bernard Geis Assoc.,* 293 F.Supp. 130, 146 (1968) (finding that an author's reproduction of frames of film footage recording President Kennedy's assassination (the Zapruder film) caused little, if any, damage to copyright holder and was thus a fair use of the film); *Schnapper v. Foley,* 667 F.2d 102 (D.C.Cir.1981) (discussing whether, under the copyright law, the United States Government may receive and hold copyrights transferred to it by assignment, bequest, or otherwise)). But Defendants fail to show how or why these cases, and not *Cohen,* control the instant case. Notably, Defendants never conduct a fair use analysis as did the courts in *Belmore* and *Bernard Geis.* Further, Defendants provide, and the court finds, no reason why *Schnapper* would have any bearing on the instant case. Accordingly, the court finds Defendants' citations unpersuasive.

Similarly, Defendants cite to *United States v. Paramount Pictures,* 334 U.S. 131, 158, 68 S.Ct. 915, 92 L.Ed. 1260 (1948) (anti-trust case) (*see* Mem. in Opp. at 5, 7) and Kreiss, "Copyright Fair Use of Standardized Tests," 48 Rutgers Law Review No. 4, 1043 (1996) (*see id.* at 4–5, 7) for the contention that the primary purpose of copyright law is to benefit the public by releasing created works to the public. And Defendants cite generally to *College Entrance Exam. Bd. v. Pataki,* 893 F.Supp. 152 (N.D.N.Y.1995) for the assertion that a recent trend in state legislation requires disclosure of standardized tests. Again, however, Defendants never even attempt to demonstrate why or how these

concepts apply here or how the Board's actions "chilled" their First Amendment rights. (*See* Resp. at 6.) These bare references fail to undermine the principles discussed above and fail to demonstrate that the First Amendment protects Defendants' publication of the copyrighted tests.

Additionally, Defendants cite to *Triangle Pubs., Inc. v. Knight–Ridder Newspapers, Inc.,* 445 F.Supp. 875 (S.D.Fla.1978) for the contention, "[w]hen the Copyright Act and the First Amendment ... operate at cross purposes, the primacy of the First Amendment mandates that the Copyright Act be deprived of effectuation." (Mem. in Opp. at 6.) Again, Defendants offer no reason why this general assertion applies to the specific facts of the instant case, and the court finds *Triangle Pubs.* inapplicable for three reasons. First, *Triangle Pubs.* utilized a fair use analysis, which, as noted above, Defendants never performed. Second, *Triangle Pubs.* predates *Cohen* by 13 years and offers nothing to suggest that applying *Cohen* here is erroneous. Third, as the Second Circuit stated in 1982,

> In *Triangle,* the District Court held that the fair use doctrine did not protect the defendant's use of a photograph of TV Guide's cover in comparative advertisements, but that the First Amendment nonetheless prevented the issuance of an injunction to stop it. That case is alone in its holding and is not even the law of the Fifth Circuit: *the affirmance found that the use made of the cover was fair, and did not reach the First Amendment issue.*

*Roy Export Co. Establishment of Vaduz, Liechtenstein v. Columbia Broadcasting Sys., Inc.,* 672 F.2d 1095, 1099 n. 10 (2d Cir.1982) (emphasis added).

In short, Defendants fail to discuss their cited authority and fail to even minimally develop their arguments. The court notes that it is not obliged to make Defendants' arguments for them. *See Outsource Int'l v. Barton,* 192 F.3d 662, 669 (7th Cir.1999) ("defendants' argument is underdeveloped and unsupported by law and, therefore, it is waived.") (*citing United States v. Brock-*

*smith,* 991 F.2d 1363, 1366 (7th Cir.1993) ("The premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them.")); *Reidt v. County of Trempealeau,* 975 F.2d 1336, 1341 (7th Cir.1992) (plaintiff waived disparate impact claim alleged in complaint by failing to fulfill her "minimal responsibility of identifying the applicable law and arguing why the facts ... fit into the parameters of that law."); *Freeman United Coal Mining Co. v. Office of Workers' Compensation Programs,* 957 F.2d 302, 305 (7th Cir.1992) ("[W]e have no obligation to consider an issue that is ... not developed [ ] in a party's brief."). Thus, Defendants' failure to develop their cited authority does not obligate the court to do so. Nevertheless, the court has reviewed Defendants' cited authority and finds no support for Defendants' First Amendment right to publish the copyrighted tests.

To summarize, in the case at bar, *Substance* received copies of confidential, copyrighted educational tests through, according to Defendants, anonymous sources. Schmidt, unconcerned that the Board prohibited the tests' reproduction and distribution, published copies of certain tests in *Substance* in violation of the Copyright Act, 17 U.S.C. § 106(1). The unauthorized publication destroyed the published (and possibly the unpublished) tests' usefulness and value. Given these facts, the court finds that Defendants possessed no First Amendment right to publish the copyrighted tests. *See Cohen,* 501 U.S. at 669, 111 S.Ct. 2513; *Zacchini,* 433 U.S. at 576–79, 97 S.Ct. 2849; *San Francisco Arts,* 483 U.S. at 541, 107 S.Ct. 2971; *Branzburg,* 408 U.S. at 684, 92 S.Ct. 2646; *Dallas Cowboys Cheerleaders,* 600 F.2d at 1188. Defendants offer no authority to the contrary.

Furthermore, Defendants present only one reason for publishing the tests: to stir public debate about them. (*See* Countercl.

¶ 27); (*see also* Mem. in Opp. at 3.) While creating public awareness of potentially ineffective educational tests is an admirable goal, it fails to convert Defendants' copyright violations to conduct protected by the First Amendment. The court notes that "[l]itigants may plead themselves out of court by alleging facts that establish defendants' entitlement to prevail." *Bennett v. Schmidt*, 153 F.3d 516, 518 (7th Cir.1998). In other words, a "plaintiff can plead himself out of court by alleging facts which show that he has no claim, even though he was not required to allege those facts." *Soo Line R.R. Co. v. St. Louis S.W. Ry. Co.*, 125 F.3d 481, 483 (7th Cir. 1997). The court is not " 'obliged to ignore any facts set forth in the complaint or its attached exhibits, *see* Fed.R.Civ.P. 10(c), that undermine the plaintiff's claim.' " *Hamilton v. O'Leary*, 976 F.2d 341, 343 (7th Cir.1992) (*quoting R.J.R. Services, Inc. v. Aetna Casualty & Surety Co.*, 895 F.2d 279, 281 (7th Cir.1989)); *see also Soo Line R.R. Co.*, 125 F.3d at 483 ("[J]udicial efficiency demands that a party not be allowed to controvert what it has already unequivocally told a court by the most formal and considered means possible."). Given that Defendants sole motivation for publishing the tests was to stir public debate, the court finds that the First Amendment provides no protection for Defendants actions.

### 1. Defendants' Counterclaims

Moreover, the court finds no set of circumstances that would afford Defendants First Amendment protection for publishing the copyrighted tests. Thus, although Defendants direct their First Amendment arguments toward "certain of Defendants' Affirmative Defenses" (Mem. in Opp. at 2), to the extent they base their Counterclaims on First Amendment protections, those are untenable and fail as a matter of law. (*See* Countercl. ¶¶ 19–21.) Accordingly, the court grants the Board's Rule 12(b)(6) Motion to Dismiss Defendants' Counterclaims to the extent they assert First Amendment violations.

### 2. Defendants' Third and Fourth Affirmative Defenses

■ The Board also moves to strike, apparently under Federal Rule of Civil Procedure 12(f), Defendants' Second, Third, and Fourth Affirmative Defenses. (*See* Mem. in Supp. at 5.) The court first addresses the Board's motion to strike Defendants' Third Affirmative Defense (Publication of copyrighted tests are privileged under First and Fourteenth Amendments) and Fourth Affirmative Defense (Publication of copyrighted tests are privileged under "Free Speech and Press provisions of applicable state constitutions"). (*See* Affirmative Defenses at 26.) Although the Board's motion to strike is technically untimely under the 20 day limitation of Rule 12(f), "upon the court's own initiative at any time, the court may order stricken from any pleading any insufficient defense . . . ." Fed.R.Civ.P. 12(f); *see also Williams v. Jader Fuel Co., Inc.*, 944 F.2d 1388, 1400 (7th Cir.1991) (stating that "Courts have read Rule 12(f) to allow a district court to consider a motion to strike at any point in a case, reasoning that it is considering the issue of its own accord despite the fact that its attention was prompted by an untimely filed motion.") (citations omitted); *Trull v. Microsoft Corp.*, No. 97–2709, 1998 WL 25195, at *1 (N.D.Ill. Jan.13, 1998). Accordingly, the court addresses the merits of Defendants' Third and Fourth Affirmative Defenses. *See Williams*, 944 F.2d at 1400; *Trull*, 1998 WL 25195, at *1.

■ Under Federal Rule of Civil Procedure 8(a), a defendant must set forth a "short and plain statement" of the affirmative defense. *See Heller Fin. Inc. v. Midwhey Powder Co., Inc.*, 883 F.2d 1286, 1294 (7th Cir.1989) (*citing Bobbitt v. Victorian House, Inc.*, 532 F.Supp. 734, 736–37 (N.D.Ill.1982)). The Board does not argue that Defendants improperly plead these affirmative defenses under Rule 8(a), but contends that because the First Amendment affords no protection for Defendants' actions, the defenses must be stricken.

(*See* Mem. in Supp. at 5.) In general, courts disfavor motions to strike, because such motions potentially serve only to delay. *See Heller Fin.*, 883 F.2d at 1294; *see also Codest Eng'g v. Hyatt Int'l Corp.*, 954 F.Supp. 1224, 1228 (N.D.Ill.1996); *Wilson v. City of Chicago*, 900 F.Supp. 1015, 1023 (N.D.Ill.1995). Where, however, motions to strike "remove unnecessary clutter from the case, they serve to expedite, not delay." *Heller Fin.*, 883 F.2d at 1294. Thus, motions to strike "will not be granted unless it appears to a certainty that plaintiffs would succeed despite any state of the facts which could be proved in support of the defense ... and are inferable from the pleadings." *Williams*, 944 F.2d at 1400 (citations omitted); *see also Codest Eng'g*, 954 F.Supp. at 1228; *Wilson*, 900 F.Supp. at 1023–24. Put another way, motions to strike affirmative defenses should be granted where the affirmative defenses are "patently defective and could not succeed under any circumstances." *Mobley v. Kelly Kean Nissan, Inc.*, 864 F.Supp. 726, 732 (N.D.Ill.1993)).

Having determined that Defendants possessed no First Amendment right to publish the Board's copyrighted tests, the court concludes that under no circumstances can Defendants prevail under their Third ("First and Fourteenth Amendment privilege") and Fourth ("Free Speech and Press provisions of applicable state constitutions privilege") affirmative defenses. Accordingly, the court opts to "remove unnecessary clutter from the case[,]" and grants the Board's motion to strike Defendants' Third and Fourth Affirmative Defenses. *Heller Fin.*, 883 F.2d at 1294.

## C. Defendants' Fair Use Affirmative Defense

Next, the Board moves to strike, again apparently under Federal Rule of Civil Procedure 12(f), Defendants' Fair Use Affirmative Defense. (*See* Mem. in Supp. at 5; Second Affirmative Defense, Answer at 26.) As discussed above, the court considers the untimely motion to strike (*see* cases cited *supra* p. 18), and again notes that motions to strike "will not be granted

unless it appears to a certainty that plaintiffs would succeed despite any state of the facts which could be proved in support of the defense ... and are inferable from the pleadings." *See* cases cited *supra* p. 19.

Whether a use qualifies as a permissible fair use is a mixed question of law and fact. *See Harper & Row Publishers., Inc. v. Nation Enters.*, 471 U.S. 539, 560, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985). Furthermore, the court recognizes that fair use affirmative defenses are not typically decided pursuant to motions to strike. *Cf. Cortland Line Co., Inc. v. Orvis Co., Inc.*, 1997 WL 808608, at *4 (N.D.N.Y. 1997) ("[a]lthough affirmative defenses may be raised in a motion to dismiss, defenses such as the fair use doctrine involve a more detailed analysis of the facts at issue and are best resolved by summary judgment motions or adjudication at trial."); *Int–Elect Engineering, Inc. v. Clinton Harley Corp.*, 1993 WL 557639, at *2 (N.D.Cal.1993) (same). However, faced with the facts of the instant case, the court finds it proper to grant the Board's motion to strike Defendants' fair use affirmative defense. As discussed below, the court necessarily finds that "it appears to a certainty that plaintiffs would succeed despite any state of the facts which could be proved in support of the defense ... and are inferable from the pleadings." *Williams*, 944 F.2d at 1400.

The fair use doctrine, codified at § 107 of the Copyright Act provides:

Notwithstanding the provisions of section 106, the fair use of a copyrighted work ... for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

(1) the purpose and character of the use, including whether such use is of a

commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. No single fair use factor is dispositive of the issue, and all of the factors must be considered in light of the purposes of copyright. *See Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 577, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994). "The task is not to be simplified with bright-line rules, for the statute, like the doctrine it recognizes, calls for case-by-case analysis." *Id.* Moreover, Defendants bear the burden of demonstrating their fair use affirmative defense. *See id.* at 591, 114 S.Ct. 1164 (*citing Harper & Row*, 471 U.S. at 561, 105 S.Ct. 2218).

In the instant case, despite the Board's detailed analysis of the fair use factors, *see* Reply at 6–9, Defendants present little to support that their use of the tests was fair. For example, in their Memorandum in Opposition, Defendants assert, but never develop or otherwise support, that "[t]he scope of the fair use doctrine is wider when the use relates to issues of public concern[,]"[7] (Mem. in Opp. at 8) (*quoting National Rifle Ass'n v. Handgun Control Fed.*, 15 F.3d 559, 562 (6th Cir.1994)). *But see Harper & Row*, 471 U.S. at 569, 105 S.Ct. 2218 (holding that verbatim copying of former President Gerald Ford's unpublished manuscript, a matter of public concern, was not a fair use of the manuscript). Further, Defendants cite to Professor Nimmer who "instructs us that there remains an ongoing conflict or paradox between the First Amendment and Copyright, and a continuing 'Need to Reconcile Copyright and the First Amendment.'" (Mem. in Opp. at 10–11) (*citing* 1 Nimmer on Copyright § 1.10[A] (1998).) Defendants also state that "[t]he defenses of fair use and free speech should be kept separate...." (*See* Mem. in Opp. at 11) (*citing* 1 Nimmer on Copyright § 1.10[A] (1998).) Again, however, Defendants fail to demonstrate how these generalities apply here. Finally, Defendants basically ignore the Board analysis of the factors, *see* Reply at 6–9, and merely respond, "Even assuming *arguendo* defendants copied 'entire' works, that circumstance alone would not be dispositive in a proper fair-use analysis." (Sur-reply at 2.)

In sum, Defendants never even recite the fair use factors in any of their pleadings, much less discuss how those factors weigh in their favor. Defendants offer nothing substantive to support a fair use argument, and the court is not obliged to make their arguments for them. *See* cases cited *supra* p. 14. Furthermore, Defendants offer no indication that they plan to present facts, argument, or analysis in support of a fair use later. Accordingly, Defendants fail to meet their burden of demonstrating that the publication of the tests constitutes a fair use, and do not suggest that they will argue the point later. *See Campbell*, 510 U.S. at 577, 114 S.Ct. 1164; (*citing Harper & Row*, 471 U.S. at 561, 105 S.Ct. 2218); *see also Bauer*, 150 F.3d at 763; *Midway Manuf. Co.*, 1994 WL 188531, at * 2.

█ Moreover, the court finds that, given the background surrounding the publication of the tests, Defendants cannot support a fair use affirmative defense under any circumstances. As indicated above, the Supreme Court conducted a fair use analysis in *Harper & Row*, 471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588. In that case, former president Gerald Ford contracted with Harper & Row Publishers, Inc. to publish his unwritten memoirs. *See id.* at 542, 105 S.Ct. 2218. As the memoirs neared completion, Harper &

---

7. The court notes that the public may also be concerned with the potential utility of the costly test project than with one person's attempt to stir public debate about the tests by publishing them.

Row contracted with Time Magazine to provide Time with excerpts of the memoirs for a fee. *See id.* at 542–53, 105 S.Ct. 2218. Shortly before Time published the magazine edition containing the excerpts of the memoirs, Nation Magazine published a 2,250–word article which included "verbatim quotes of the author's original language totaling between 300 and 400 words and constituting some 13% of The Nation article." *Id.* at 548–49, 105 S.Ct. 2218. The Court rejected The Nation's argument "that the public's interest in learning this news as fast as possible outweighed the right of the author to control its first publication[,]" because this theory would "expand fair use to effectively destroy any expectation of copyright protection in the work of a public figure." *Id.* at 556–557, 105 S.Ct. 2218. The Court then analyzed the case using the fair use factors and determined that The Nation's use of verbatim excerpts from the unpublished manuscript was not a fair use. *Id.* Likewise, examining the four fair use factors here, the court finds that Defendants' publishing of the tests fails a fair use analysis.

## 1. Purpose and Character of Use

The first factor, the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes, weighs heavily against a fair use. The "fact that a publication was commercial as opposed to nonprofit is a separate factor that tends to weigh against a fair use[,]" *Harper & Row,* 471 U.S. at 562, 105 S.Ct. 2218 (*citing Sony Corp. of Am. v. Universal City Studios, Inc.,* 464 U.S. 417, 451, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984)), but is not the only factor. *See Campbell,* 510 U.S. at 584, 114 S.Ct. 1164 ("the commercial or nonprofit educational purpose of a work is only one element of the first factor enquiry...."). Nonetheless, the court notes that (1) *Substance* is a for-profit newspaper owned by Schmidt, whose goal is, presumably, to increase sales and profits; and (2) any publication of the tests (whose creation allegedly cost approximately $1.3 million (*see* Am.Compl. ¶ 9)) would destroy their

confidentiality, and diminish the Board's future educational use of them. (*See id.* ¶ 49.) Accordingly, that the tests were published in Schmidt's for-profit newspaper weighs against Defendants' assertion of a fair use.

Furthermore, even if the court ignores that *Substance* is a for-profit newspaper, and assumes, as Defendants argue, that the sole purpose of publishing the tests was to stir public debate over the tests' effectiveness, the "sensitive balancing of interests" in making the purpose or character of use determination weighs against Defendants. *Campbell,* 510 U.S. at 584, 114 ´S.Ct. 1164 (discussing whether rap group 2 Live Crew's parody of Roy Orbison's *Oh, Pretty Woman* was a fair use of the original song and determining that the commercial character of the parody did not create a presumption against fair use); *see also Sony,* 464 U.S. at 451, 104 S.Ct. 774. Defendants' actions have few redeeming qualities to balance out the interests of the Board. Defendants chose to print substantial portions of the tests to the detriment of the tests' owner, a charitable foundation, and taxpayers. Furthermore, Defendants could have stirred debate over the tests in a way that did not destroy the usefulness of five, if not six or more, of the 22 tests. Even if Defendants' actions revealed that the tests are invalid, Defendants' actions which destroy someone else's confidential, costly property is difficult to condone. Thus, even if Defendants' sole motivation for publishing the tests was to generate public debate, the character of Defendants' use of the tests weighs against that use being fair. *Cf. Harper & Row,* 471 U.S. at 562, 105 S.Ct. 2218 (stating that the Court is unable to ignore the impropriety of defendant's publishing of a purloined manuscript); *see also Cohen,* 501 U.S. at 669, 111 S.Ct. 2513 ("truthful information sought to be published must have been lawfully acquired.").

## 2. Nature of the Copyrighted Work

The second factor, the nature of the copyrighted work, also demonstrates that

publishing the tests was not a fair use. "This factor calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Campbell*, 510 U.S. at 586, 114 S.Ct. 1164. "The fact that a work is unpublished is a critical element of its 'nature'" and "the scope of fair use is narrower with respect to unpublished works." *Harper & Row*, 471 U.S. at 564, 105 S.Ct. 2218 (citations omitted) (stating that publishing purloined manuscripts verbatim in order to "scoop" the material's owner's news story is a use that so clearly infringes the copyright holder's interests in confidentiality and creative control that it is difficult to characterize such a use as fair). In the case at bar, the Board developed the tests to determine the educational levels of students, and the need to keep the tests confidential and out of the public realm is obvious. Publishing the tests destroyed their confidentiality and prevents the Board from using the published tests (and possibly the unpublished tests) in the future. Thus, the nature of the copyrighted work favors the Board.

### 3. Amount of Work used in Relation to the Whole

Third, the court finds that the "amount and substantiality of the portion used in relation to the copyrighted work as a whole" weighs against a fair use as well. "[T]his factor calls for thought not only about the quantity of the materials used, but about their quality and importance, too." *Campbell*, 510 U.S. at 587, 114 S.Ct. 1164. Furthermore, "whether 'a substantial portion of the infringing work was copied verbatim' from the copyrighted work is a relevant question ..., for it may reveal a dearth of transformative character or purpose under the first factor, or a greater likelihood of market harm under the fourth...." *Campbell*, 510 U.S. at 587, 114 S.Ct. 1164 (*quoting Harper & Row*, 471 U.S. at 565, 105 S.Ct. 2218). In the instant matter, Defendants printed five entire tests and a substantial portion of a

sixth, all but guaranteeing that the published tests (and possibly the unpublished ones) would be unusable in the future. At the very least, Defendants placed more than 22% of the testing materials into the public realm. Moreover, each test can be viewed as its own educational tool. Considering the tests in this manner, Defendants ruined 100% of each of the reproduced tests. This degree of publication demonstrates a substantial portion of the tests as a whole and weighs against a fair use. *See Harper & Row*, 471 U.S. at 548–49, 105 S.Ct. 2218 (finding against a fair use where the published article included "verbatim quotes of the author's original language totaling between 300 and 400 words and constituting some 13% of The Nation article.").

### 4. Effect on the Market

Finally, the effect on the market factor also disfavors Defendants. As noted in *Harper & Row*, the Copyright Act "focuses on the effect of the use upon the potential market for *or value of* the copyrighted work[,]" and is the single most important element of fair use. 471 U.S. at 565, 105 S.Ct. 2218 (citations and internal marks omitted) (emphasis added). While most cases present issues related to the potential commercial market for a copyrighted work, this is not always the case. *See e.g. Quality King Dists.*, 118 S.Ct. at 1128 (noting unusual posture of that copyright case where plaintiff wished to protect the integrity of its marketing method, and not its copyrighted product labels). In the case at bar, the market factor centers around "the value of the copyrighted work[,]" not its potential commercial market. *See Harper & Row*, 471 U.S. at 566, 105 S.Ct. 2218. The tests' value lies in the Board's ability to used them repeatedly in the future. Defendants' publication of the tests significantly decreased that value, and the court need not determine at this time the monetary damage Defendants caused. The court finds no difference between a copyright holder losing future profits because of a copyright infringement

and a the Board losing its future educational value of its copyrighted work. Further, Defendants offer nothing to show that their actions did not harm the Board *Cf. id.* at 567, 105 S.Ct. 2218 ("once a copyright holder establishes with reasonable probability the existence of a causal connection between the infringement and a loss of revenue, the burden properly shifts to the infringer to show that this damage would have occurred had there been no taking of copyright expression."). Thus, like the other three factors, the market factor also weighs against Defendants.

In sum, Defendants fail to even discuss any of the four fair use factors.[8] And given that Defendants willfully (or, at the very least, recklessly) destroyed the value of the Board's property in an effort to generate public debate about the tests' validity, the court finds no set of circumstances under which Defendants can prevail under a fair use affirmative defense. Thus, the Board will succeed despite any set of facts "which could be proved in support of the defense ... and are inferable from the pleadings." *Williams,* 944 F.2d at 1400; *Codest Eng'g,* 954 F.Supp. at 1228; *Wilson,* 900 F.Supp. at 1023–24; *Mobley,* 864 F.Supp. at 732. Accordingly, in an effort to "remove unnecessary clutter from the case," *Heller Fin.,* 883 F.2d at 1294, the court grants the Board's motion to strike Defendants' Fair Use Affirmative Defense.

## D. Pickering Balancing Test

Defendants also cite to *Pickering v. Bd. of Educ.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) and state that the court should sustain their Counterclaims because "a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment." (Mem. in Opp. at 14.) However, Defendants' mere citation

to *Pickering* (and that's all it is), is unpersuasive and fatally unsupported. *See* cases cited *supra* at 928. Furthermore, the court notes that Defendants never assert that the Board dismissed Schmidt, but only that the Board suspended Schmidt without pay. (*See* Countercl. at 27.) Nevertheless, the court addresses whether a *Pickering* analysis is appropriate and if so, whether Defendants can prevail under that analysis.

Before the court addresses the merits of Defendants' "argument," it must first provide the background relevant to *Pickering.* In *Board of County Commissioners, Wabaunsee County., Kan. v. Umbehr,* 518 U.S. 668, 679, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996), the Supreme Court iterated that the First Amendment provides no absolute guarantee of freedom of speech, rather, it "protects government employees from termination *because* of their speech on matters of public concern." *Id.* (*citing Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)). "To prevail, an employee must prove that the conduct at issue was constitutionally protected, and that it was a substantial or motivating factor in the termination." *Wabaunsee County.,* 518 U.S. at 679, 116 S.Ct. 2342. Moreover, even if a defendant clears the "constitutionally protected activity" hurdle, "termination because of protected speech may be justified when legitimate countervailing government interests are sufficiently strong." *Id.; see also Marshall v. Allen,* 984 F.2d 787, 797 n. 8 (7th Cir.1993). When examining allegations of such a termination, "[g]overnment employees' First Amendment rights depend on the balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public ser-

---

**8.** Defendants cite *Belmore v. City Pages, Inc.,* 880 F.Supp. 673 (D.Minn.1995); *Triangle Pubs.,* 445 F.Supp. 875; and *Hustler Magazine, Inc. v. Moral Majority, Inc.,* 796 F.2d 1148 (9th Cir.1986) in apparent support of their fair use affirmative defense. (*See* Mem.

in Opp. at 9.) However, Defendants again neglect to discuss or otherwise demonstrate how these cases apply to the case at bar. Furthermore, the court finds these cases dissimilar to the case at bar and unpersuasive.

vices it performs through its employees." *Wabaunsee County.*, 518 U.S. at 680, 116 S.Ct. 2342 (*citing Pickering*, 391 U.S. at 568, 88 S.Ct. 1731). "The key to First Amendment analysis of government employment decisions, then, is this: The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer." *Wabaunsee County*, 518 U.S. at 680, 116 S.Ct. 2342 (*citing Waters v. Churchill*, 511 U.S. 661, 674, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (plurality opinion approved by seven Justices)). In addition, the Seventh Circuit recently summarized the *Pickering* analysis this way:

> In *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), the Court set out a two-pronged balancing test to determine whether a public employee's First Amendment rights have been violated. First, it must be determined whether the speech (or association) is on a matter of public concern. If it is, then the court must balance the interest of the public employee, as a citizen, in commenting upon matters of public concern with the interest of the government, as the employer, in promoting the efficiency of the public services it provides.

*Klug v. Chicago Sch. Reform Bd. of Trustees*, 197 F.3d 853, 857 (7th Cir.1999); *see also Weicherding v. Riegel*, 160 F.3d 1139, 1142 (7th Cir.1998); *Messman v. Helmke*, 133 F.3d 1042, 1045 (7th Cir.1998).

However, as *Wabaunsee County* illustrates, "an employee must prove that the conduct at issue was constitutionally protected" before undertaking a *Pickering* analysis. 518 U.S. at 679, 116 S.Ct. 2342. Only after an employee clears the "constitutionally protected activity" hurdle does a court address whether the employee's termination because of protected speech was justified by legitimate countervailing government interests. *See id.* As discussed above, the court has already determined as a matter of law that the First Amendment does not protect Defendants' conduct. *See*

discussion *supra* pp. 10–19; *see also Button v. Kibby–Brown*, 146 F.3d 526, 528 (7th Cir.1998) ("[w]hether a public employee's speech has protected status presents a question of law determined in the first instance by the trial judge....") (*quoting Wright v. Illinois Dept. of Children and Family Servs.*, 40 F.3d 1492, 1499–1500 (7th Cir.1994)) (other citations omitted). Thus, accepting as true the well-pleaded facts in Defendants' Counterclaims, as the court must, *see Klug*, 197 F.3d at 857, the court finds that Defendants fail to clear to "constitutionally protected activity" hurdle. Accordingly, the court need not conduct a *Pickering* balancing test to determine whether the First Amendment protects the publishing of the tests. Nevertheless, the court proceeds with a *Pickering* analysis.

While courts ordinarily are reluctant to perform the *Pickering* balancing test on the basis of the pleadings (because of the liberal notice pleading requirements of Federal Rule of Civil Procedure 8(a)) where a plaintiff chooses to plead particulars, and those particulars " 'show he has no claim, then he is out of luck—he has pleaded himself out of court.' " *Id.* at 858; (*quoting Thomas v. Farley*, 31 F.3d 557, 558–559 (7th Cir.1994) and *citing Jefferson v. Ambroz*, 90 F.3d 1291 (7th Cir.1996)); *see also Bennett v. Schmidt*, 153 F.3d 516, 518 (7th Cir.1998) ("[l]itigants may plead themselves out of court by alleging facts that establish defendants' entitlement to prevail.") Again, the court notes that "judicial efficiency demands that a party not be allowed to controvert what it has already unequivocally told a court by the most formal and considered means possible." *Soo Line R.R. Co.*, 125 F.3d at 483.

In the instant case, whether styled as a First Amendment violation or a substantive due process violation, Defendants assert one theory in their Counterclaims: The First Amendment allows Defendants to publish copyrighted tests as a way to stir public debate. Thus, the instant case, like *Klug*, "is one of those rare cases in

which the balancing can be performed based on the facts in the complaint." *Klug* 197 F.3d at 859.

■ The court begins by assuming that Defendants satisfy the first *Pickering* step, that is, the court assumes that the tests' validity is a matter of public concern. *See id.* at 857. The court thus proceeds to the second step in the *Pickering* analysis. That step requires a balancing of the interests of the employee, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees. *See id.; see also Feldman v. Ho,* 171 F.3d 494, 497 (7th Cir.1999) (stating that where "speech proves excessively disruptive of an employer's mission, then the employer may respond."); *Weicherding,* 160 F.3d at 1142). The relevant factors to consider in performing the balancing in this case are: (1) the effect of Schmidt's conduct on the orderly maintenance and efficiency of the Chicago Public Schools; (2) the effect of Schmidt's constitutionally protected activity on his ability to perform his duties; (3) the nature of Schmidt's employment, including whether his position is one of loyalty or confidence; (4) the time, place, and manner of Schmidt's speech or activity; (5) the context in which the dispute arose; and (6) whether the matter was one on which debate was vital to decision. *See id.* at 858 (*citing Kokkinis v. Ivkovich,* 185 F.3d 840, 845 (7th Cir. 1999)); *see also Weicherding* 160 F.3d at 1142 (*citing Wright v. Illinois Dept. of Children & Family Servs.,* 40 F.3d 1492, 1502 (7th Cir.1994)).

Given these factors and the facts presented in the pleadings, Defendants' Counterclaims do not survive even a motion to dismiss. Examining the factors, the court first recognizes that Defendants' publication of the tests drastically impeded the Board's interest in efficiently educating and determining the education levels of students. Second, Schmidt's ability to perform his teaching duties were minimally affected by publishing the tests. Third,

as a teacher administering the tests, Schmidt was in a position of confidence. That he received the tests from anonymous sources is irrelevant, as the court again notes that "truthful information sought to be published must have been lawfully acquired." *See Cohen,* 501 U.S. at 669, 111 S.Ct. 2513. Fourth, the time, place, and manner of Schmidt's attempt to stir public debate significantly damaged the value of the tests. Fifth, the "context in which the dispute arose," that is, the Board's disciplinary action against Schmidt for publishing its copyrighted tests, is not an egregiously inappropriate response. *See Feldman,* 171 F.3d at 497 (stating where "speech proves excessively disruptive of an employer's mission, then the employer may respond.") Finally, the Board's decision to discipline Schmidt was not one on which debate was vital. In sum, these balancing factors demonstrate that the Board's interest in efficiently promoting its educational mission outweighs Schmidt's interest in commenting upon the tests by publishing several of them in their entirety. The court finds that Defendants could produce no facts to sway the balance.

Additionally, when applying the *Pickering* test, the Supreme Court has "consistently given greater deference to government predictions of harm used to justify restriction of employee speech than to predictions of harm used to justify restrictions on the speech of the public at large.'" *Wabaunsee County,* 518 U.S. at 680, 116 S.Ct. 2342 (*quoting Waters,* 114 S.Ct. at 1887). In the case at bar, Defendants' publication of the copyrighted tests, designed for years of use, completely destroyed the value of several, if not all, of the tests. Thus, given that (1) Defendants had no First Amendment right to publish the copyrighted tests; (2) the *Pickering* factors weigh heavily against Defendants' interest in publishing the tests; (3) Defendants' actions harmed the Board's use of the tests in the future; and (4) Defendants complete lack of support for sustaining their Counterclaims under a *Pickering*

analysis,[9] the court concludes that even if a *Pickering* balancing test applies, Defendants' Counterclaims fail.

## E. Substantive Due Process Claim

■ Next, Defendants assert that their Counterclaims state violations of their substantive due process rights (*see* Mem. in Opp. at 16.) However, it is well established that "[w]here a particular amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.' " *See County of Sacramento v. Lewis,* 523 U.S. 833, 118 S.Ct. 1708, 1714, 140 L.Ed.2d 1043 (1998) (holding that a police officer's killing of motorcycle passenger during high-speed chase was not covered by any Constitutional Amendment) (*quoting Albright v. Oliver,* 510 U.S. 266, 273, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (plurality opinion of Rehnquist, C.J.) (*in turn quoting Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) ("Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct [police officer's excessive force during an investigatory stop], that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims."))); *see also Conn v. Gabbert,* 526 U.S. 286, 119 S.Ct. 1292, 1296, 143 L.Ed.2d 399 (1999) (refusing to determine validity of substantive due process claim because "[c]hallenges to the reasonableness of a search by government agents clearly fall under the Fourth Amendment, and not the Fourteenth"); *Tesch v. County of Green Lake,* 157 F.3d 465, 472 (7th Cir.1998) (rejecting attempt to circumvent

dismissal of Fourth Amendment unreasonable arrest claims by appealing substantive due process claim based on the unreasonable arrest); *Thaddeus–X v. Blatter,* 175 F.3d 378, 387–88 (6th Cir.1999) (finding that a warden's retaliation against the protected speech of an inmate aiding a fellow inmate's litigation, was covered by the First Amendment, and thus, stated no substantive due process claim); *Valot v. Southeast Local Sch. Dist. Bd. of Educ.,* 107 F.3d 1220, 1232 (6th Cir.1997) (concurring opinion) (stating that where plaintiff grounds what he repeatedly refers to as his "constitutional right" under the First Amendment, and fails to allege that the interest of which he has been deprived is found either in the life, liberty, or property components of the Fourteenth Amendment, the right is not protected by the Due Process Clause, but by the First Amendment); *Nestor Colon Medina & Sucesores, Inc. v. Custodio,* 964 F.2d 32, 45 (1st Cir. 1992) ("To the extent [plaintiff's] substantive due process claim is based on the alleged retaliation for his political views, it is coextensive with his First Amendment claim [and] there is obviously no need to enter the uncharted thicket of substantive due process to find an avenue for relief. . . ."); *Davis v. Olin,* 886 F.Supp. 804, 812 (D.Kan.1995) (dismissing substantive due process claim because it paralleled First Amendment claim of retaliatory discharge for speaking out on an issue of public concern); *Silva v. Univ. of N.H.,* 888 F.Supp. 293, 325 (D.N.H.1994) (granting summary judgment as to plaintiff's substantive due process allegation because it was the same claim as plaintiff's First Amendment claim).

In the case at bar, Defendants clearly seek the First Amendment's protection in their substantive due process Counter-

---

9. The court also notes that in their Response, Defendants cite *Walsh v. Ward,* 991 F.2d 1344 (7th Cir.1993); *Cliff v. Bd. of Sch. Commissioners,* 42 F.3d 403 (7th Cir.1994); and *Hulbert v. Wilhelm,* 120 F.3d 648 (7th Cir.1997) for the broad assertion that "a cause of action under § 1983 to obtain legal and equitable relief for such deprivations of constitutional

rights was recognized by the Court of Appeals for the Seventh Circuit[.]" (Resp. at 5.) Defendants fail to discuss any of these cases even briefly, and the court finds that none of them support Defendants' Counterclaims of substantive due process or First Amendment violations under the circumstances.

claims. The Counterclaims, in their entirety, allege:

## V. CLAIMS FOR RELIEF

19. At all times relevant to the action complained of herein, the Chicago School Reform Board and Paul Vallas are each "persons" within the meaning of that term as it is used in 42 U.S.C. § 1983.

20. When, under color of state law, they participated in the decision making process regarding George Schmidt's employment *and* the filing of this lawsuit, the Chicago School Reform Board and Paul Vallas deprived Substance, Inc. and George Schmidt of their rights guaranteed by the First Amendment of the United States Constitution, as made applicable to the states and their subordinate municipalities by the Fourteenth Amendment to the United States Constitution.

21. When participating in the conduct outlined above, the Chicago School Reform Board and Paul Vallas acted wilfully, recklessly, with callous indifference to, and in gross disregard of the constitutional rights of Substance, Inc. and George Schmidt.

(Countercl. ¶¶ 19–21.) Hence, Defendants specify no constitutional right violations other than violations of the First Amendment. (*See id.*)

Additionally, Defendants' Response and Memorandum in Opposition further demonstrate that they seek only First Amendment protection. For example, Defendants argue that (1) "[i]t is necessary for Schmidt and Substance to invoke the Fourteenth Amendment and 'due process' in their claims which assert their First Amendment rights[,]" (Resp. at 6); (2) "[Defendants' Counterclaims] raise claims based on violations of the First Amendment rights of [Defendants,]" (Mem. in Opp. at 2); (3) "it is clear that Schmidt was punished by the Board for his lawful exercise of his rights under the First Amendment and has, therefore, stated a cause upon which relief may be granted[,]" (Mem. in Opp. at 14); (4) even if Defen-

dants violated copyright laws, "the court will also have to determine if the Board (and Vallas) subsequently violated the First Amendment rights of Schmidt and Substance by disciplining Schmidt for his role in publishing Substance[,]" (Mem. in Opp. at 15); and (5) "it was necessary for Schmidt and Substance to plead their First Amendment rights as also being Fourteenth Amendment rights, redress for which is sought through § 1983." (Mem. in Opp. at 16.) Thus, the court finds that Defendants' Counterclaims allege nothing more than First Amendment violations. (*See* Countercl. at 30–32.) Furthermore, that Defendants' First Amendment claim fails has no bearing on the court's dismissal of Defendants' substantive due process Counterclaims. *See Tesch*, 157 F.3d at 471 (refusing to entertain substantive due process claim of unreasonable arrest after district court granted summary judgment as to Fourth Amendment claim of unreasonable arrest and appellant did not appeal dismissal of Fourth Amendment claim). Accordingly, the court dismisses the Counterclaims.

To the extent that Defendants' substantive due process Counterclaims can be read to assert claims other than First Amendment violations, their Counterclaims boil down to this: The Board's disciplinary action against Schmidt and filing of the instant suit is a violation of Defendants' substantive due process rights. As discussed below, this bare-bones allegation fails to state a due process claim upon relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).

 The Supreme Court has repeatedly emphasized that " '[t]he touchstone of due process is protection of the individual against arbitrary action of government[.]' " *Lewis*, 118 S.Ct. at 1716 (*quoting Wolff v. McDonnell*, 418 U.S. 539, 558, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)). This due process guarantee protects not only against denials of fundamental procedural fairness, *see Lewis*, 118 S.Ct. at 1716 (*citing, e.g., Fuentes v. Shevin*, 407 U.S.

67, 82, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972)), but also against the "the exercise of power without any reasonable justification in the service of a legitimate governmental objective[.]" *Lewis*, 118 S.Ct. at 1716 (*citing, e.g., Daniels v. Williams*, 474 U.S. 327, 331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (stating that the substantive due process guarantee protects against government power arbitrarily and oppressively exercised)). The Supreme Court emphasizes that "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense[.]' " *Lewis*, 118 S.Ct. at 1716 (*quoting Collins v. Harker Heights*, 503 U.S. 115, 129, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)). Moreover, the Due Process Clause was intended to prevent government officials "from abusing [their power], or employing it as an instrument of oppression." *Collins*, 503 U.S. at 129, 112 S.Ct. 1061 (citations omitted). In the case at bar, Defendants had no right to publish the Board's tests. *See* discussion *supra* pp. 925–30. Hence, the Board's actions against Defendants are not of the egregious and oppressive type which violate Defendants' substantive due process rights.

Furthermore, in *Washington v. Glucksberg*, the Supreme Court iterated that the Due Process Clause provides, in addition to those freedoms spelled out in the Bill of Rights, "heightened protection against governmental interference with certain fundamental rights and liberty interests," such as the right to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, to choose an abortion, and to refuse unwanted lifesaving medical treatment. 521 U.S. 702, 720, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (citations omitted). However, as a general matter, the Court has " 'always been reluctant to expand the concept of substantive due process because the guideposts for responsible decisionmaking in this uncharted area are scarce and open-ended.' " *Id.* (*quoting Collins v. Harker Heights*, 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)). The Seventh

Circuit recently emphasized this reluctance to expand substantive due process:

[W]e have spent some time looking through the Constitution for the Substantive Due Process Clause without finding it.... The fact that [substantive due process] is a doctrine owing its existence to constitutional structure rather than a clear grant of power to the judiciary has led the Supreme Court to be cautious in its use.

*Khan v. Gallitano*, 180 F.3d 829, 833 (7th Cir.1999) (*quoting National Paint & Coatings Assoc. v. City of Chicago*, 45 F.3d 1124, 1129 (7th Cir.1995)).

To determine if a court should expand substantive due process to cover a certain allegation, a court must invoke the substantive due process analysis set forth in *Glucksberg*. *See Khan*, 180 F.3d at 833 ("The courts have long struggled to identify the appropriate analysis for substantive-due-process claims ..., [b]ut in [ ]*Glucksberg* ..., a five-justice majority of the Court agreed on a single analysis."). The *Glucksberg* Court described the substantive due process analysis the following way:

First, ... the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed. Second, we have required in substantive-due-process cases a careful description of the asserted fundamental liberty interest. Our Nation's history, legal traditions, and practices thus provide the crucial guideposts for responsible decision making that direct and restrain our exposition of the Due Process Clause.

521 U.S. at 720–21, 117 S.Ct. 2258 (holding that asserted right to assistance in committing suicide not a fundamental liberty interest protected by the Due Process Clause because that "right" is not deeply rooted in our Nation's traditions); *see also*

*Khan,* 180 F.3d at 833, 835 (holding that plaintiff "failed to show why the right to be free from tortious interference by state actors is a fundamental right deeply rooted in out history and tradition or implicit in the concept of ordered liberty."); *cf. Dunn v. Fairfield Comm. High Sch. Dist. No. 225,* 158 F.3d 962, 965 (7th Cir.1998) ("The Constitution does not guarantee ... students the right not to receive an 'F' in a course from which they were excluded because of misbehavior."); *Zorzi v. Cty. of Putnam,* 30 F.3d 885, 894 (7th Cir.1994) (holding that occupational liberty, such as arbitrary or capricious termination, is not protected by substantive due process, and stating that "in the absence of a life, liberty or property interest [the plaintiff asserting a substantive due process claim] could be terminated for arbitrary and capricious reasons.") (*citing DeTomaso v. McGinnis,* 970 F.2d 211, 214 (7th Cir.1992)).

In the case at bar, Defendants fail to "carefully formulate the interest at stake[.]"*see Khan,* 180 F.3d at 833. Other than asserting that they have a First Amendment right to publish the tests (which, as discussed above, precludes their parallel substantive due process Counterclaims, *see supra* at 936–38), Defendants provide no description of any fundamental right in their Counterclaims or in their pleadings. Indeed, Defendants fail to address the point. Additionally, Defendants fail to show, and the court cannot discern, (1) how their substantive due process Counterclaims differ from allegations of First Amendment violations, or (2) how their right to publish the Board's copyrighted tests "is a fundamental right deeply rooted in out history and tradition or implicit in the concept of ordered liberty assert a precise substantive due process liberty" *Id.; see also Glucksberg,* 521 U.S. at 720–21, 117 S.Ct. 2258.

The court again notes that Defendants' scant support of their position is unpersuasive. For example, Defendants's cite only one case and only for the principle that "the liberty of the press and of speech is within the liberty safeguarded by the due process clause of the Fourteenth Amendment from invasion by state action." (*See* Mem. in Opp. at 16) (*citing Near v. Minnesota,* 283 U.S. 697, 706, 51 S.Ct. 625, 75 L.Ed. 1357 (1931)). Defendants also refer to Tribe, American Constitutional Law, §§ 11–2 at 773, but again their "argument" is unsubstantiated: "[t]he Supreme Court decisions drawing on the Bill of Rights to restrict state action have frequently limited the permissible *substance* of state law and not merely its procedures for applying rules to particular cases." (Mem. in Opp. at 16.) In short, Defendants offer nothing to support that they properly state Counterclaims of substantive due process violations. Thus, for the above reasons, Defendants fail to state a substantive due process claim pursuant to Rule 12(b)(6).

## F. Vallas

Finally, the Board argues that the court should dismiss Vallas as a Defendant because Defendants named him only in his official capacity. However, because none of Defendants' Counterclaims survive the Board's motion to dismiss, the point is moot.

## G. Federal Rule of Civil Procedure 12(c)

██ The court emphasizes that it based its granting of the Board's motion to dismiss on Rule 12(b)(6) because Defendants' Counterclaims fail to state First Amendment violation or substantive due process violation claims upon relief could be granted. *See* Fed.R.Civ.P. 12(b)(6). However, the Seventh Circuit recently clarified that Federal Rule of Civil Procedure 12(c) is the appropriate mechanism to dismiss a formally sufficient complaint when a plaintiff "does nothing to back it up after the defendant moves for dismissal...." *See Walker v. National Recovery, Inc.,* 200 F.3d 500, 1999 WL 1257386, at *4 (7th Cir.1999); (*citing Johnson v. Revenue Mgt. Corp.,* 169 F.3d 1057 (7th Cir.1999)); *Kirksey v. R.J. Reynolds Tobacco Co.,* 168 F.3d 1039 (7th Cir.1999); Fed.R.Civ.P. 12(c) ("After the pleadings are closed ...,

any party may move for judgment on the pleadings."). In the case at bar, Defendants' scant support for their First Amendment and substantive due process Counterclaims (and the court notes Defendants' complete lack of support for its fair use and *Pickering* analysis "arguments") do not compel further litigation on those points. Accordingly, even if the Counterclaims technically state claims pursuant to Rule 12(b)(6), the court grants the Board's motion to dismiss (or, more accurately, motion for judgment on the pleadings), based on the reasoning set forth in this opinion, pursuant to Rule 12(c). *See Walker,* 1999 WL 1257386, at *4.

### III. Conclusion

For the foregoing reasons, the court grants the Board's motion to dismiss Defendants' Counterclaim and Third–Party Complaint. The court also grants the Board's motion to strike Defendants' Second, Third, and Fourth Affirmative Defenses.

IT IS SO ORDERED.